*Samuel Hull v. ConvergeOne, Inc.*

# EXHIBIT A
## *ConvergeOne, Inc.'s*
## *Notice of Removal*

 CT Corporation

**Service of Process Transmittal**
03/23/2020
CT Log Number 537440323

**TO:**   Rui Goncalves
ConvergeOne
5 STEWART CT
DENVILLE, NJ 07834-1042

**RE:**   **Process Served in Minnesota**

**FOR:**   ConvergeOne, Inc.  (Domestic State: MN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Samuel Hull, Pltf. vs. Convergeone, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | Second Judicial District Court, Ramsey County, MN<br>Case # NONE |
| **NATURE OF ACTION:** | Employee Litigation |
| **ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Inc, Saint Paul, MN |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/23/2020 at 12:55 |
| **JURISDICTION SERVED :** | Minnesota |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | Sonta Miller-Van Oort<br>SAPIENTIA LAW GROUP, PLLC<br>120 South Sixth Street<br>Suite 100<br>Minneapolis, MN 55402<br>612-756-7100 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/25/2020, Expected Purge Date: 03/30/2020<br><br>Image SOP<br><br>Email Notification, Rui Goncalves rgoncalves@convergeone.com<br><br>Email Notification, Selina Held sheld@convergeone.com |
| **SIGNED:**<br>**ADDRESS:** | CT Corporation System, Inc<br>208 LaSalle Ave<br>Suite 814<br>Chicago, IL 60604 |
| **For Questions:** | 866-539-8692<br>CorporationTeam@wolterskluwer.com |

Page 1 of  2 / GS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process
Transmittal**
03/23/2020
CT Log Number 537440323

**TO:** Rui Goncalves
ConvergeOne
5 STEWART CT
DENVILLE, NJ 07834-1042

**RE:** **Process Served in Minnesota**

**FOR:** ConvergeOne, Inc.  (Domestic State: MN)

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED: | DATE AND HOUR OF SERVICE: | TO: | CT LOG NUMBER: |
|---|---|---|---|
| SUMMONS, COMPLAINT, ATTACHMENT(S) | By Process Server on 12/10/2018 at 10:34 | Rui Goncalves ConvergeOne | 534539056 |

Page 2 of  2 / GS

Information displayed on this transmittal is for CT
Corporation's record keeping purposes only and is provided to
the recipient for quick reference. This information does not
constitute a legal opinion as to the nature of action, the
amount of damages, the answer date, or any information
contained in the documents themselves. Recipient is
responsible for interpreting said documents and for taking
appropriate action. Signatures on certified mail receipts
confirm receipt of package only, not contents.

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF RAMSEY                              SECOND JUDICIAL DISTRICT
                                                  Case Type: Employment

---

Samuel Hull,                          Court File No._____

        Plaintiff,

                              **SUMMONS**

v.

ConvergeOne, Inc.

        Defendant.

---

THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT:

    **1. YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

    **2. YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at: 120 South Sixth Street, Suite 100, Minneapolis, MN 55402.

    **3. YOU MUST RESPOND TO EACH CLAIM**. The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    **4. YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

    **5. LEGAL ASSISTANCE**. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal

assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

     **6. ALTERNATIVE DISPUTE RESOLUTION**.  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

                           **SAPIENTIA LAW GROUP, PLLC**

Dated:  3/21/20                   s/Sonia Miller-Van Oort
                           Sonia Miller-Van Oort (#278087)
                           Ryan O. Vettleson (#312915)
                           120 South Sixth Street, Suite 100
                           Minneapolis, MN 55402
                           612-756-7100
                           soniamv@sapientialaw.com
                           ryanv@sapientialaw.com

                           -and-

                           **Vilendrer Law, PC**

                           Ellie K. Vilendrer (#0391795)
                           3800 American Blvd. West, Suite 1500
                           Minneapolis, MN 55431
                           (612) 889-4207
                           Ellie@VilendrerLaw.com

                           *ATTORNEYS FOR PLAINTIFF*
                           *SAM HULL*

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded should this pleading be found in violation of Minn. Stat. § 549.211, subd. 2.

**SAPIENTIA LAW GROUP, PLLC**


Dated: _____          _____
                               Sonia Miller-Van Oort (#278087)
                               Ryan O. Vettleson (#312915)
                               120 South Sixth Street, Suite 100
                               Minneapolis, MN 55402
                               612-756-7100
                               soniamv@sapientialaw.com
                               ryanv@sapientialaw.com

                               *ATTORNEYS FOR PLAINTIFF*
                               *SAMUEL HULL*

3

STATE OF MINNESOTA                                        DISTRICT COURT

COUNTY OF RAMSEY                                 SECOND JUDICIAL DISTRICT
                                                           Case Type: Employment

---

Samuel Hull,                              Court File No._____

               Plaintiff,
                                                    **SUMMONS**
v.

ConvergeOne, Inc.

               Defendant.

---

THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT:


    **1. YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

    **2. YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at: 120 South Sixth Street, Suite 100, Minneapolis, MN 55402.

    **3. YOU MUST RESPOND TO EACH CLAIM**. The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    **4. YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS**. If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the complaint.

    **5. LEGAL ASSISTANCE**. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal

assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

      **6. ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

**SAPIENTIA LAW GROUP, PLLC**

Dated: 3/21/20

s/Sonia Miller-Van Oort
Sonia Miller-Van Oort (#278087)
Ryan O. Vettleson (#312915)
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
612-756-7100
soniamv@sapientialaw.com
ryanv@sapientialaw.com

-and-

**Vilendrer Law, PC**

Ellie K. Vilendrer (#0391795)
3800 American Blvd. West, Suite 1500
Minneapolis, MN 55431
(612) 889-4207
Ellie@VilendrerLaw.com

*ATTORNEYS FOR PLAINTIFF*
*SAM HULL*

2

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded should this pleading be found in violation of Minn. Stat. § 549.211, subd. 2.

**SAPIENTIA LAW GROUP, PLLC**

Dated: _____

_____
Sonia Miller-Van Oort (#278087)
Ryan O. Vettleson (#312915)
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
612-756-7100
soniamv@sapientialaw.com
ryanv@sapientialaw.com

*ATTORNEYS FOR PLAINTIFF*
*SAMUEL HULL*

3

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT
Case Type: Employment

Samuel Hull,

        Plaintiff,

v.

ConvergeOne, Inc.

        Defendant.

Court File No._____

**COMPLAINT**
**(JURY TRIAL REQUESTED)**

## **INTRODUCTION**

Plaintiff Samuel Hull ("Hull") brings this lawsuit to recover unpaid commissions due him from his employer, Defendant ConvergeOne, Inc. Hull alleges as follows:

## **PARTIES**

1.      Plaintiff Samuel Hull ("Hull") is an individual resident of the City of Salt Lake City, State of Utah.

2.      Defendant ConvergeOne, Inc. ("ConvergeOne" and the "Company") is a Minnesota corporation with its registered office address located in the City of St. Paul, State of Minnesota and its principal executive office located in the City of Eagan, County of Dakota, State of Minnesota.

3.      ConvergeOne is a leading global IT and managed services provider of collaboration and technology solutions.

4.      ConvergeOne utilizes sales personnel and national account managers to sell its products and services to generate revenue for the company.

## VENUE

5.       ConvergeOne conducts business and maintains its corporate headquarters in Dakota County.

6.       Hull's cause of action arose in Dakota County.

7.       Venue is proper in Ramsey County pursuant to Minn.Stat. §542.09.

## FACTS

### Hull's Success as a National Account Manager

8.       Beginning on August 1, 2016, Hull became employed as one of ConvergeOne's National Account Managers. ConvergeOne recruited Hull in large part due to his existing business relationship with Westlake Services, LLC ("Westlake").

9.       On or about December 13, 2016, Hull booked an important and sizeable deal with Westlake (the "Westlake Private Cloud Contract").

10.      The Westlake Private Cloud Contract entitled ConvergeOne to approximately $7.7 million in revenue and was the largest Cisco Contact Center cloud deal in ConvergeOne's history.

11.      The Westlake Private Cloud Contract was also the first Cisco Private Cloud deal for ConvergeOne.

12.      In January 2017, Hull received the "New Logo Deal of the Year" award at ConvergeOne's annual sales conference as a result of his work on the Westlake Private Cloud Contract.

13.      Hull was one of ConvergeOne's top salespeople in 2017, 2018, and 2019.

2

14.     Hull earned the distinction of being named to ConvergeOne's "President's Club" in 2016, 2017, 2018, and 2019.

15.     Hull's unprecedented success spearheading deals in the private cloud space has created immense value for ConvergeOne.

16.     Hull's unprecedented success spearheading deals in the private cloud space has also created immense value for ConvergeOne's customers.

## The Westlake Expansion & Extension Deal

17.     ConvergeOne renews existing client contracts within the final year of the contract.

18.     From approximately May 2018 through May 2019, Hull worked hard to expand the Westlake Private Cloud Contract with Westlake (the "Expansion & Extension Deal").

19.     The Expansion & Extension Deal was a private cloud engagement and expanded the Westlake Private Cloud Contract.

20.     The Expansion & Extension Deal involved Westlake's purchase of additional Managed Services, Product, and Professional Services from ConvergeOne.

21.     The Expansion & Extension Deal was not a renewal of the Westlake Private Cloud Contract.

22.     By early December 2018, the Expansion & Extension Deal was verbally  accepted by Westlake.

3

23.     At that time, Westlake's Private Cloud Contract with ConvergeOne still had over three years remaining on their existing contract.

24.     Westlake wanted to formally close the Expansion & Extension Deal in March 2019, and expressed that to ConvergeOne.

25.     Due to internal delays from ConvergeOne's Cloud Managed Services sales team, the closing of the Expansion & Extension Deal was delayed until May 2019.

26.     Hull's year-long labor resulted in the close of the Expansion & Extension Deal on May 15, 2019.

27.     The Expansion & Extension Deal had a total contract value (i.e., sales revenue to ConvergeOne) of more than $17,000,000.00.

28.     The Expansion & Extension Deal provided superior value to meet Westlake's needs while providing a handsome margin to ConvergeOne.

### 2017 Variable Compensation Plan/C1C Plan

29.     Between January 1, 2017 up until days before Hull formally closed the Expansion & Extension deal in May 2019, Hull's compensation was governed by an agreement called the 2017 Variable Compensation Plan for National Account Managers (the "2017 Variable Compensation Plan") or the "C1C Plan."

30.     ConvergeOne's 2017 Variable Compensation Plan incentivized National Account Managers ("NAMs"), including Hull, to maximize the Company's profit margin on the deals NAMs closed.

4

31.     Commissions were based and earned on actual gross profit margins achieved by ConvergeOne on the products and services sold.

32.     The commission structure under the 2017 Variable Compensation Plan set commission rates for three different segments of products/services sold up to a specific quota dollar amount (i.e., Product/Resale Gross Margin Segment, Pro Services Gross Margin Segment, and OnGuard Gross Margin Segment).

33.     In addition to the basic commission rates applied to the products and services sold, sales made in the above three segment areas that exceeded the established quota amount were entitled to increased commission rates ("Escalator Rates") for the sales above the quota amounts.

34.     Under the 2017 Variable Compensation Plan, after "all sales documentation is complete and accepted by the Company, and the Sales Order is operationally executable, if applicable, a project will be considered complete (a "Completed Project")."

35.     The 2017 Variable Compensation Plan also provided bonuses paid when certain quotas were reached in each of the three categories.

36.     Under the 2017 Variable Compensation Plan, commissions were based on gross profit margins of sales.

37.     Under that plan, "Gross Margin (GM)" is defined as revenues less cost of goods sold.

5

38. Under the 2017 Variable Compensation Plan, Hull earned commissions of 22% of the gross-profit margin made on Managed Services he sold to customers.

39. ConvergeOne's 2017 Variable Compensation Plan clarified that it paid commissions on Completed Projects in advance of the employee's earning the commission as follows:

- For OnGuard contracted service periods not prepaid - 50% of the commission amount is paid in the month following booking and the balance is paid 12 months after booking date.

- For Professional Services contracts - 50% of the commission will be paid in the month after booking and the balance will be paid when invoice is paid in full.

- For product contracts - commission is paid in the month following client payment of invoice.

40. Motivated by the compensation structure of the 2017 Variable Compensation Plan, Hull leveraged his adept understanding of ConvergeOne's cost structure and long-standing relationship with Westlake to craft the complex Expansion & Extension Deal.

## Proposed Changes to the Commissions Plan

41. Between 2017 and 2019, ConvergeOne has had more than 30 different compensation plans across its sales teams.

6

42.     On or around February 14, 2019, Klaus Hillman, Executive Vice President, U.S. West ("Hillman"), announced that a new compensation plan applicable to NAMs would be rolled out to go live on July 1, 2019 .

43.     During the February 14, 2019 web conference, Hillman presented a PowerPoint presentation to NAMs regarding the upcoming commissions plan.

44.     A slide titled "NAM Compensation Fundamentals" informed NAMs that the upcoming compensation plan was "not a cost-cutting measure" and that NAMs would have the option of either (1) "salary plus a % on GP [Gross Profit]", or (2) "pay on paid GP [Gross Profit]."

45.     During this web conference, ConvergeOne promised to provide NAMs with more details on the plan when they were distributed.

46.     The February 14, 2019 PowerPoint presentation stated that training on the new compensation plan would occur from May to June 2019.

47.     As explained on February 14, 2019, the commission plan was not supposed to take effect until July 1, 2019, with first commissions on this plan dispersed on or about July 31, 2019.

48.     On or about April 15, 2019, Hull asked his Sales Director, Anthony Scialabba ("Scialabba"), for clarification on the upcoming plan, particularly whether it would be more lucrative for a NAM to close a deal under the upcoming commission plan  or the 2017 Variable Compensation Plan.

7

49.    In response to Hull's request, Scialabba sent an email inquiry to the then-Regional

Vice President Jaeson Galli ("Galli") and Regional Financial Director Lisa Tonn.

50.    Scialabba posed the following to Galli and Tonn:

*Jaeson and Lisa,*

*Acknowledging the new NAM Compensation Plan takes effect on July 1st – could
a NAM in any way be disadvantaged by closing and collecting prior to 7/1 if the
2019 [May] Plan stands to be more lucrative for the NAM than their current
plan?*

*OR...come July 1st, does "everything" true-up back to January 1st if indeed the
going-forward 2019 Plan stands to be more lucrative?*

51.    Although Scialabba and Hull discussed the above inquiry made to Galli and Tonn,

Hull was not advised of any response from Galli and Tonn to Scialabba.

52.    Instead, on April 17, 2019, Scialabba provided Hull with a 9-page commissions

plan with a forwarded message from Shawn Mevissen, ConvergeOne Compensation & HRIS

Analyst ("Mevissen"), requesting that Hull sign and return the new agreement by May 1, 2019.

53.    The commissions plan provided to Hull indicated that it would be effective as of

April 1, 2019 (the "April Plan").

54.    The April Plan included a compensation element and a commission element.

55.    The April Plan stated in the very first paragraph that it is "designed to recognize

and reward the successful performance of team members" and "Highest earnings are dependent

upon gross profit..."

56.    The April Plan stated that "commissions are paid based on gross profit."

8

57.     This reference to "gross profit" in the April Plan indicated that NAMs were incentivized, as before, to maximize the company's profit margin on deals.

58.     The April Plan stated that Hull would be "eligible to earn a commission of 10% paid monthly **on gross profit** collected during the previous month on ConvergeOne products and services sold by [him]" for the compensation element (i.e., salary) of the April Plan.

59.     Under the April Plan "gross profit" or "GP" was defined as:

… the difference between the amounts invoiced to the customer, less cost of goods sold (COGS), cost of service by the Company, and further deductions as stated below. Service cost is defined as the company's internal coast as sold margin or actual cost of services by a third party. This applies to margin realized on both product sales, services sales, and shipping. Further deductions may include:

- Any Open Account Receivable Write-Offs
- Customer Credits and Adjustments by the Company
- Return of Product and/or Reversal of Services rendered
- Freight Costs not charged to the customer
- Customer payment credit card fees

60.     The April Plan further stated that the Company would pay "based on the tables below generated by you each month, as measured by invoices on accounts in which you were actively engaged as a direct sales person or sales manager within your designated sales territory."

61.     Within the tables in the April Plan, ConvergeOne stated that "Margins/GP" for Private Cloud offerings sold by the sales team member were determined as follows:

- Hardware, software, pro-services are earned following the normal practices for those revenue categories.

- Maintenance/managed services will be paid at 30% margin of TCV (For MS Sales >$500K, first half is paid after contact [sic] and second is paid after 12 months, when margin assumptions are verified, with additional SPIF
    of 1% of margin).

9

62.    "TCV" is referred to as "Total Contract Value" in the May Plan.

63.    Most cloud deals earn an average of 35% gross profit. Hull created deals with an average of over 60% gross profit, and his commissions were always based on the entirety of the gross profit he generated for ConvergeOne.

64.    Under the April Plan, commissions were to be paid "within 30 days following the month of customer payment."

65.    Commissions were to be earned under the April Plan after the customer's payment had been received and was no longer subject to refund, rebate, discount, or return of the product.

66.    After reviewing the April Plan by himself, Hull had questions about it.

67.    In most companies, it is customary for a sales manager or director to go over a new compensation plan with their sales representatives.

68.    Despite representations by the Enterprise President that the new commissions plan would be accompanied with training about how any new commissions plan would work, ConvergeOne failed to provide training on a plan that was a significant departure from the way Hull had always been compensated at ConvergeOne.

69.    ConvergeOne and Scialabba knew and understood that Hull's commissions had been paid based on actual margins achieved by the company under his 2017 Variable Compensation Plan.

70.    After receiving the April Plan, Hull presented Scialabba with several questions.

10

71.     Despite Hull's request for information and explanation as to how the April Plan would be applied, no one at ConvergeOne provided Hull with responses to a number of his questions, namely, how would the April Plan effect the Expansion & Extension Deal commissions.

72.     ConvergeOne, knowing that Hull was only days away from closing the epic Expansion & Extension Deal, responded with increased pressure to Hull to sign the April Plan.

73.     Hull inquired of Scialabba the possibility of changing the April Plan language to give clarity around the Expansion & Extension Deal that had been previously negotiated over the last year.

74.     On April 30, 2019, Scialabba exchanged text messages with Hull, reporting that Galli told him to convey to Hull that "the plan is the plan" and "the language is not changeable."

75.     Hull asked Scialabba whether Galli had run the questions posed about the April Plan up the flagpole (i.e., up the chain of command).

76.     Scialabba told Hull that he didn't know if Galli had run Hull's questions up the flagpole.

77.     To appease Hull's concern that his questions were left unanswered, Scialabba relayed the following to Hull:

   •     "Now that you'll be on a comp plan that's in stone, I trust the risk of incurring any snags is diminished"

   •     he trusted the Company would "act in good faith"

11

- "In my opinion, and interpretation, I wouldn't think you/we have anything to worry about when it comes to Westlake."

78.     On April 30, 2019, Scialabba continued to pressure Hull to sign the agreement that night in order to be "in compliance" with ConvergeOne's directive.

79.     Relying on (i) Scialabba's reassuring words that Hull's commission on the Expansion & Extension Deal would not be disadvantaged by signing the April Plan, that the company was acting in good faith (i.e., not trying to deceive him about its intended application of the commission plan), and indication that the April Plan application and timing being imposed on Hull was the same for all NAMs; and (ii) relying on Hillman's prior representations that the commissions plan being issued was not a "cost-cutting measure" by the company, Hull understood that the April Plan was more lucrative than the 2017 Variable Compensation Plan and Hull signed the April Plan on April 30, 2019.

## ConvergeOne's Bait and Switch

80.     In Hull's professional experience, most private cloud deals that NAMs close earn an average of 35% gross profit for those related goods and services.

81.     As a top performer at ConvergeOne, Hull generated private cloud deals with an average of over 60% gross profit.

82.     Prior to the dispute set forth herein, Hull's commissions on his deals were always determined based on the entirety of the gross profit he generated for ConvergeOne.

83.     The Expansion & Extension Deal was signed by Westlake in mid-May 2019.

12

84.   The Expansion & Extension Deal that Hull closed with Westlake had a blended margin of over 72%, including 81% on the Expansion and 94% on the Extension for Managed Services, culminating in over $12.4 million of profit to ConvergeOne.

85.   Under the April Plan, 30% of the margin on the Westlake Expansion & Extension Deal should have resulted in earned commissions of approximately $3,801,745 for Hull's work on the Expansion & Extension Deal.

86.   There had been discussion between ConvergeOne and NAMs about the general option of moving from a salary plus commissions model to a commissions-only model during the February 14, 2019 PowerPoint presentation.

87.   Hull informed ConvergeOne he would choose a commissions-only model of compensation when asked, but that change was not implemented by the company.

88.   The first half of Hull's commissions on the Expansion & Extension Deal was due to him by June 30, 2019.

89.   The second half of Hull's commissions on the Expansion & Extension Deal is due to him by June 30, 2020.

90.   Under the prior 2017 Variable Compensation Plan, Hull would have been entitled to commission of approximately $2,677,000, at least $2,500,000 of which related to Managed Services purchased by Westlake.

91.   As a member of ConvergeOne's President's Club, Hull's exceptional performance in 2018 earned him a reward trip to France with an elite group of salespeople in early May 2019.

13

92. While on the France trip in May 2019, just one week after he signed and submitted the April Plan, Hull heard rumor that ConvergeOne did not intend to base NAMs' commissions on gross profit margins as set forth in the April Plan he signed.

93. Hull heard that instead, ConvergeOne intended to calculate commissions by using *a maximum margin of 30%* (referred to as "imputed margin"), which the company would apply to all private cloud deals *regardless of the deal's actual margin*.

94. "Imputed margin" was not a term used or defined in the April Plan.

95. "Imputed margin" is not a term Hull had ever heard of before signing the April Plan.

96. At no time prior to Hull's signing of the April Plan had any ConvergeOne executive or manager mentioned or explained the concept of "imputed margin."

97. "Imputed margin" was not discussed during the February 2019 PowerPoint presentation made to NAMs.

98. At no time prior to Hull's signing of the April Plan had any ConvergeOne executive or manager indicated that "imputed margin" was a term or methodology to be applied in calculating commissions under the new commissions plan being rolled out to NAMs.

99. During the France trip, Hull attempted to raise questions about the April Plan and the "imputed margin" term he was hearing with Hillman, the executive who had architected the compensation plan and who was in attendance, but Hillman indicated he would address the issue later.

14

100.     On May 20, 2019, Hull sent an email to Hillman to follow-up on his concerns raised at the dinner in France.

101.     Through correspondence with ConvergeOne's finance department on May 21, 2019, Hull was told for the first time that the April Plan was never implemented.

102.     As of May 21, 2019, Ben To and Melissa Howarth (the Regional Finance Director), individuals who were in charge of implementing the transition of employees' compensation plans, claimed they were unaware that Hull had entered into a compensation plan different than the 2017 Variable Compensation Plan.

103.     As such, Hull learned that ConvergeOne's finance department believed payments were due to him under the 2017 Variable Compensation Plan or "C1C Plan" as it was referred to by abbreviation.

104.     ConvergeOne did not pay Hull his first commission payment related to the Expansion & Extension deal that was due in June 2019.

105.     During a company call on July 16, 2019, the President of ConvergeOne Enterprise, John Lyons, announced that the new commission plan he had discussed would not be rolled out until the start of 2020, rather than going live on July 1, 2019.

106.     Lyon's statement did not make entire sense in view of the fact that Hull had in fact ben forced to sign the April Plan before the Expansion & Extension Deal was closed.

15

107.    The next day, however, on July 17, 2019, ConvergeOne's finance department did some type of reconciliation of monthly commissions due to Hull seemingly applying the April Plan, but doing so inconsistent with the April Plan terms.

108.    On July 31, 2019, Scialabba verbally told Hull that the April Plan was "null and void" and he restated this in an email to Hull on August 5, 2019.

109.    On August 7, 2019, Hull delivered a written demand for payment of the first half of commissions due him for the Westlake Expansion & Extension Deal. Hull requested that Scialabba forward the payment request on to the finance department and that a detailed explanation of the commission calculation accompany the payment.

## The September 2019 Commission Plan

110.    On August 12, 2019, Scialabba sent Hull a different commissions plan to sign (the "September Plan").

111.    In another email sent on August 12, 2019, Scialabba represented to Hull that the September Plan would commence on September 1, 2019 and that this new proposed plan was the "standard legacy 'NACR plan.'"

112.    Scialabba stated and agreed in his August 12, 2019 email to Hull that the September Plan was intended to replace the 2017 Variable Compensation Plan (C1C plan) in effect currently.

113.    The September Plan intended to drastically reduce commissions earned by Hull on deals he closed.

16

114.    On August 22, 2019, by email, Hull inquired again about payment of his overdue commissions related to the Expansion & Extension Deal.

115.    Scialabba responded to Hull that he had taken no action to process Hull's demand for payment.

116.    On or about September 3, 2019, Hull again requested that ConvergeOne pay the commissions due him from the Expansion & Extension Deal.

117.    Between approximately June 12, 2019 and at least September 18, 2019, individuals and managers from ConvergeOne's Finance Department and leadership team discussed how they could manipulate margin interpretations to minimize commission payments to Hull.

118.    On September 5, 2019, via voicemail, Scialabba demanded that Hull sign the September Plan and advised that he would be meeting the following day with Lindsey Wagner (Senior Financial Analyst), Kelly Cunningham (Commission Director), and Rui Goncalves (General Counsel) to determine what commissions plan would apply to the overdue Expansion and Extension Deal commissions owed to Hull.

119.    Scialabba indicated that there was confusion as to what commission plan applied to the Expansion and Extension Deal, but emphasized in his voicemail to Hull that it would be up to the discretion of the company to determine (in September 2019) which commission plan applied to the deal that closed in May 2019.

120.    Hull renewed his written request for payment again on October 23, 2019.

17

121. On October 28, 2019, Scialabba reported to Hull that he had spoken with several members of ConvergeOne's leadership to discuss commissions owed to Hull. Scialabba referred to the April Plan as one Hull signed under duress.

122. On November 4, 2019, Adam Petrovsky ("Petrovsky") (Regional Vice-President who replaced Galli), Lisa Tonn (Regional Finance Director), and Scialabba held a phone conference with Hull to discuss his past due commissions. Management explained that they had debated what plan should apply and what decision should be made regarding commissions to be paid to Hull.

123. During the November 4, 2019 meeting, ConvergeOne informed Hull that the Company was not going to apply the signed 2017 Variable Compensation Plan to the Expansion & Extension Deal Hull completed in May 2019.

124. During the November 4, 2019 meeting, ConvergeOne informed Hull that the Company was not going to apply the signed April Plan to the Expansion & Extension Deal Hull completed in May 2019.

125. During the November 4, 2019 meeting, ConvergeOne instead informed Hull that (i) there has been confusion about what commission plan Hull's Expansion & Extension Deal was subject to, (ii) the proposed, but unsigned, September Plan would be applied to the Expansion & Extension Deal that closed in May 2019; (iii) the company was taking the view that "imputed margin" was the metric to be used in calculating the subject commissions, (iii) applying "imputed margin" calculations, ConvergeOne had underpaid Hull on certain portions of the sale and had overpaid Hull on other portions of the sale, and (iv) the Company planned to

18

pay Hull approximately $300,000.00 for the commissions on the Expansion & Extension Deal that had been due on June 30, 2019.

126. Scialabba took great pains during the phone call to repeatedly state that the April Plan was voided and not at issue.

127. Petrovsky represented that leadership had had a dozen calls prior to the November 4, 2019 call to reach a decision on how to pay Hull for the Expansion & Extension Deal.

128. Petrovsky stated during the call that during the dozen leadership calls preceding the November 4, 2019 call, there had been no conversation or discussion about paying Hull under the 2017 Variable Compensation Plan.

129. Hull was surprised to hear this because his grievance for the last six months was that he should have been paid commissions due for the Expansion & Extension deal under the 2017 Variable Compensation Plan.

130. Petrovsky promised to discuss this issue with Hillman and would ask that Hillman discuss with Hull.

131. Following the November 4, 2019 meeting, Petrovsky sent an email that same day to Hull stating:

> ...this email serves to officially notify you that the C1C plan was officially decommissioned from·effective April 1, 2019. We have your signature on the new plan submitted to you in May. All commissions since then, and in the future will reflect this plan, with the exception that we modified your commission rate from 10% to 25%.

132. As a result of the November 4, 2019 call, Hull learned that he had been shorted additional commissions due him outside the Expansion & Extension Deal relating to 2018 sales

and Statement of Works OP-000374104 SOW #4 and OP-000400080, because ConvergeOne did not apply the 2017 Variable Compensation Plan in effect at that time. This shorted Hull another $104,000 in commissions due him for 2018 sales on the Westlake Private Cloud Contract.

133.    Notwithstanding an acknowledgment that at least $300,000 was indisputably owed to Hull even under ConvergeOne's position as of November 4, 2019, ConvergeOne made no such payment to Hull in November or any other time since then.

134.    On December 19, 2019,  Hull was asked to attend a telephone conference with Hillman and Petrovsky.

135.    During the December 19, 2019 phone call, Hillman and Petrovsky maintained that Hull's commissions earned on the Expansion & Extension Deal would only be calculated on "imputed margin" and this would result in additional commission payment of $297,000 related to commissions due on June 30, 2019.

136.    Hillman and Petrovsky relayed that no payment for past due commissions would be made to Hull unless he agreed to take an amount less than Hull believed he was due.

137.    Hull did not agree that he was only entitled to $297,000 more for the Expansion & Extension Deal commissions due on June 30, 2019.

138.    On January 2, 2020  Hillman informed Hull that the September Plan, which Hull had never signed, has been in effect since September 1, 2019.

139.    Later in January, 2020, ConvergeOne provided Hull with yet another new compensation plan to sign (the "2020 Commission Plan.")

20

## ConvergeOne's Utter Failure to Pay

140. During the last 12 months, Hull has been among the top 2% of ConvergeOne's salespeople in the country.

141. In the last 35 months alone, Hull has generated over $30 million in revenue for ConvergeOne, helping the Company achieve approximately 60% profit on the collective deals he closed.

142. Notwithstanding Hull's performance, ConvergeOne has failed to honor its agreements to pay Hull the commissions earned on the Expansion & Extension deal, among others.

143. ConvergeOne should have booked the Expansion & Extension deal in May 2019, but didn't actually book it until July and August.

144. As of March 1, 2020, ConvergeOne has paid Hull $287,174.03 for commissions related to the Expansion & Extension deal and due as of June 30, 2019.

145. Under the 2017 Variable Compensation Plan, Hull was due approximately $1,259,270.53 in June 2019 and will be due another $1,259,270.53 on June 30, 2020.

146. ConvergeOne has already communicated its intention not to pay Hull more than $297,546 for these outstanding, past due commissions and on August 30, 2020, not more than half of the commission amounts otherwise due on June 30, 2020.

147. Under the April Plan, if applicable, Hull should have earned commissions of approximately $3,800,000, with $_1,799,389.73 being due last June 2019 for the sale of Managed Services under the Expansion & Extension Deal and $1,799,389.73 being due on June 30, 2020 for the sale of those Managed Services.

21

148.    ConvergeOne has communicated to Hull its intention not to pay commissions under the April plan as inapplicable.

149.    Notwithstanding the 2017 Variable Compensation Plan and the April Plan, ConvergeOne insists on calculating Hull's commissions regarding the Expansion & Extension Deal based on an "imputed margin" basis.

150.    ConvergeOne's proposed payment of Hull's commissions ignored the significant 74% margin he generated on the Expansion & Extension Deal and reduced the margin applied toward his commissions to only 30% on a portion of the sales and 25% on what it characterized as a "renewal."

151.    Because ConvergeOne pays NAMs less for renewals of customer contracts, it categorized portions of the sales under the Expansion & Extension Deal as renewal to pay Hull less commissions.

152.    ConvergeOne's failure to pay NAMs commissions earned under their commission plans has happened repeatedly.

## CAUSES OF ACTION

### COUNT I- FAILURE TO PAY WAGES IN VIOLATION OF MINN.STAT. §§ 181, et seq.

153.    Hull restates all allegations in this Complaint and incorporates them into this Count.

154.    Hull demanded payment of his past due commissions on the Expansion & Extension Deal on August 7, 2019 and several times since then.

22

155. ConvergeOne has failed to pay Hull commissions due him for the Expansion & Extension Deal, as well as other 2018 sales related to the Westlake Private Cloud Contract-.

156. ConvergeOne has mis-characterized and altered the methods of commissions payment applicable to the Expansion & Extension Deal with the express purpose of minimizing commissions payments to Hull.

157. ConvergeOne has a duty to make prompt payment of wages and commissions to its employees.

158. Minnesota Statutes §§181.13 and 181.14 set forth ConvergeOne's duties as an employer to make prompt payment to employees like Hull.

159. Under Minnesota Statute §181.03, ConvergeOne has a further duty not to alter its method of payment, timing of payment, or procedures for payment of commissions to which it agrees with employees to delay or reduce the amount of payment due the employee.

160. Under Minnesota Statute §181.14, subdivision 2, wages or commissions not paid within the required time period shall become immediately payable upon the demand of the employee; a penalty follows for failure to honor that demand.

161. Minnesota Statute §181.171 sets forth recoverable damages and attorney fees and costs available to a plaintiff related to filing a civil suit to enforce his rights under Minnesota Statutes §181 *et seq*.

162. Hull has repeatedly demanded payment of commissions earned related to his role as a NAM for ConvergeOne and related to the Expansion & Extension Deal.

163. ConvergeOne has intentionally, recklessly, and in bad-faith disregarded Hull's requests for payment of commissions.

23

164. ConvergeOne is aware that Hull is due commissions for the Westlake Expansion & Extension Deal, as well as other sales on that account, but refuses to pay Hull the outstanding commissions he is still due.

165. ConvergeOne has further stated its intention not to pay the full amount of commissions due Hull on June 30, 2020.

166. ConvergeOne has also, in bad-faith, tried to alter the terms of their agreements with Hull over time to impose retroactive contract terms on the Expansion & Extension Deal.

167. Not only has Hull suffered emotional distress and anxiety as a result of ConvergeOne's Conduct and failure to pay his commissions, Hull has also incurred legal fees and costs to try and collect the commissions due him.

168. As a result of ConvergeOne's conduct and violations of Minnesota Statutes §§ 181.03, 181.13, and 181.14, Plaintiff is entitled to damages, including reasonable costs and attorney fees in excess of $50,000, plus prejudgment interest.

## COUNT II- BREACH OF CONTRACT

169. Hull restates, realleges, and incorporates herein by reference each and every fact and allegation contained in the aforementioned paragraphs.

170. Hull has a valid and enforceable contract with ConvergeOne regarding compensation and commissions for Hull's employment as a National Account Manager since August 1, 2016.

171. Hull fulfilled his obligations under the parties' agreement by performing his work.

172. As part of his terms of employment with ConvergeOne, the Company has entered into various commission plan agreements set forth above to incentivize performance and sales by Hull.

24

173. ConvergeOne breached the parties' agreements regarding commissions for the Expansion & Extension Deal by failing to pay Hull the agreed-upon commissions when the aforementioned deal was closed.

174. ConvergeOne has, in bad-faith, tried to alter the terms of their agreements with Hull over time to impose retroactive contract terms on the Expansion & Extension Deal.

175. As a result of ConvergeOne's breach of the parties' agreements, Hull has suffered significant financial damages as stated herein in an amount exceeding $50,000.00, plus prejudgment interest.

## COUNT III-NEGLIGENT MISREPRESENTATION & OMISSION

176. Hull restates all allegations in this Complaint and incorporates them into this Count.

177. During a February 14, 2019 presentation by ConvergeOne's executive, Hull and other NAMs were informed that an upcoming new commissions plan would be based on gross profit margin calculations.

178. At the time that ConvergeOne presented Hull with the new commission plan in April 2019, it knew and intended for the April Plan to vary significantly from Hull's 2017 Variable Compensation Plan regarding how commissions would be calculated for payment.

179. At the time ConvergeOne presented Hull with the April Plan, it knew that his commissions earned at ConvergeOne had always been paid on actual gross profit margins.

180. At the time ConvergeOne presented Hull with the April Plan, it knew that it intended to change the gross profit margin basis for commissions to an "imputed margin" standard.

25

181.    ConvergeOne, at no time prior to April 30, 2019 ever used the term "imputed margin" in discussions with Hull.

182.    The April Plan did not include any term of "imputed margin" within it.

183.    Soon after receiving the draft April Plan, Hull asked ConvergeOne for an explanation as to how the April Plan would be applied compared to his 2017 Variable Compensation Plan so he could make an informed decision about signing the April Plan.

184.    Knowing that Hull was close to closing a big deal for the company and that his commissions would be impacted by the April Plan if ConvergeOne was no longer using gross profit or actual margins to set commissions, ConvergeOne's leadership and management purposely omitted and withheld material information from Hull about the April Plan so that he would sign the agreement before the Expansion & Extension Deal closed.

185.    Hull's manager did not provide any answer to Hull's question seeking understanding of the April Plan. Instead he assured Hull that the Company would "act in good faith."

186.    Hull's manager, Scialabba, specifically told Hull he "did not have anything to worry about when it comes to Westlake."

187.    ConvergeOne knew exactly what it intended to do to Hull in significantly reducing his commissions earned and purposefully took steps to cause him to detrimentally rely on its representations, and material omissions.

188.    ConvergeOne conveyed to Hull that he had to sign the April Plan in its original form to be "in compliance" with the company.

26

189.    On April 30, 2019, Scialabba pressured Hull to sign the agreement that night in order to be "in compliance" with ConvergeOne's directive.

190.    Hull relied on each of the above statements and representations by ConvergeOne leadership and management in signing the April Plan.

191.    ConvergeOne leadership and management negligently made false representations, and omitted material information from Hull, about the April Plan, which they knew to be contrary, to induce Hull to sign the April Plan,

192.    As a result of Hull's reliance upon Defendants' negligent misrepresentations (and negligent omissions), Plaintiff has incurred pecuniary damages in the form of lost income exceeding $50,000 to which he is entitled to recover.

193.    Plaintiff seeks recovery of such damages, plus pre-judgment interest.

## COUNT IV-UNJUST ENRICHMENT

194.    Hull restates all allegations in this Complaint and incorporates them into this Count.

195.    Hull spent a year trying to develop the Expansion & Extension Deal for the benefit of ConvergeOne's business.

196.    Hull developed the Expansion & Extension Deal to not only provide great value to the customer, but to ensure a great gross profit margin to his employer.

197.    ConvergeOne appreciated and accepted the benefit of the Expansion & Extension Deal that Hull procured on its behalf.

27

198.    ConvergeOne has retained the benefit of Hull's efforts regarding the Expansion & Extension Deal.

199.    ConvergeOne has been unjustly enriched by benefiting from Hull's work and efforts while employed with them without paying full consideration for that benefit.

200.    As a direct result, Hull has been damaged by such unjust enrichment in an amount in excess of $50,000, plus prejudgment interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sam Hull requests the following relief:

1.    An award of damages, including statutory penalty damages, in an amount to be determined at trial;

2.    An award of Hull's reasonable costs and attorneys' fees incurred herein pursuant to Minn. Stat. § 181.171 and Minnesota Rules of Civil Procedure; and

3.    Such other and further relief at law or in equity as the Court may deem just and proper.

**SAPIENTIA LAW GROUP, PLLC**

Dated:  3/21/20

s/Sonia Miller-Van Oort
Sonia Miller-Van Oort (#278087)
Demetria Dyer (#0400676)
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
612-756-7100
soniamv@sapientialaw.com
demetriad@sapientialaw.com

-and-

28

**Vilendrer Law, PC**

Ellie K. Vilendrer (#0391795)
3800 American Blvd. West, Suite 1500
Minneapolis, MN 55431
(612) 889-4207
Ellie@VilendrerLaw.com

***ATTORNEYS FOR PLAINTIFF***
***SAM HULL***

29

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded should this pleading be found in violation of Minn. Stat. § 549.211, subd. 2.

**SAPIENTIA LAW GROUP, PLLC**

Dated:  3/21/20                          Sonia Miller-Van Oort
                                         Sonia Miller-Van Oort (#278087)
                                         Ryan O. Vettleson (#312915)
                                         120 South Sixth Street, Suite 100
                                         Minneapolis, MN 55402
                                         612-756-7100
                                         soniamv@sapientialaw.com
                                         ryanv@sapientialaw.com

                                         *ATTORNEYS FOR PLAINTIFF*
                                         *SAMUEL HULL*

30