## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Samuel Hull,<br><br>                    Plaintiff,<br><br>v.<br><br>ConvergeOne, Inc.,<br><br>                    Defendant. | Case No. 20-cv-984 (SRN/KMM)<br><br><br>**ORDER ON DEFENDANT'S**<br>**MOTION TO DISMISS** |

Sonia Miller-Van Oort and Demetria Laparis Dyer, Sapientia Law Group, 120 S. 6th St., Ste. 100, Minneapolis, MN 55402; Ellie Vilendrer, Vilendrer Law, PC, 3800 American Blvd. W., Ste. 1500, Minneapolis, MN 55431, for Plaintiff.

Raphael Coburn and Andrew Murphy, Faegre Drinker Biddle & Reath, LLP, 2200 Wells Fargo Center, 90 S. 7th St., Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

    This matter is before the Court on the Second Motion to Dismiss the Second Amended Complaint [Doc. No. 60] filed by Defendant ConvergeOne, Inc. ("ConvergeOne"). In this lawsuit, Plaintiff Samuel Hull asserts claims against his employer, ConvergeOne, for violations of Minnesota and Utah wage statutes, breach of contract, negligent misrepresentation, promissory estoppel, and unjust enrichment. (Second Am. Compl. [Doc. No. 37] ¶¶ 228–320.) Defendant moves to dismiss these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court grants the motion in part and denies it in part.

1

I.      **BACKGROUND**

A.      **Hull's Sales Work**

In August 2016, ConvergeOne, a global IT and managed services provider based in Minnesota, hired Hull, a Utah resident, as a National Account Manager ("NAM").  (*Id.* ¶¶ 2–3, 9.)  ConvergeOne had recruited Hull, in part, due to his existing business relationship with Westlake Services, LLC ("Westlake"), a financial services company.  (*Id.*  ¶ 9.)

Shortly after Hull began working for ConvergeOne, the company required him to attend a three-day training session at the company's Minnesota headquarters.  (*Id.* ¶ 10.) ConvergeOne paid for Hull's travel expenses, and, while in Minnesota, provided Hull with training and social opportunities and required him to execute several new-hire employment documents.  (*Id.* ¶¶ 11–14.)  Although Hull resides in Utah, he primarily interacts with personnel in Minnesota through WebEx and Zoom day-to-day meetings and quarterly corporate conference calls.  (*Id.* ¶¶ 16–19.)  Hull has also attended ongoing training events via virtual seminars, of which approximately 17 were hosted in Minnesota during a 12-month period.  (*Id.* ¶ 23.)   Hull receives his paycheck, payroll emails, and corporate announcements from Minnesota, and participates in ConvergeOne's medical benefit plan offered by Blue Cross and Blue Shield of Minnesota.  (*Id.* ¶¶ 20–21, 24–25.)

In December 2016, Hull brokered a large "cloud deal" on ConvergeOne's behalf with Westlake ("the Westlake Private Cloud Contract") which garnered ConvergeOne approximately $7.7 million in revenue.  (*Id.* ¶¶ 27–29.)  In recognition of his work on the contract, Hull received the "New Logo Deal of the Year Award" at ConvergeOne's annual sales conference.  (*Id.* ¶¶ 27–30.)  Hull was one of ConvergeOne's top salespeople in 2017,

2018, and 2019, and the company commended him for his work annually from 2016 through 2019. (*Id*. ¶¶ 31–32.)

Hull worked to expand the Westlake Client Cloud Contract, and in December 2018, Westlake verbally accepted a new deal, the "Westlake Expansion & Extension Deal." (*Id*. ¶¶ 37–41.) Although Westlake had hoped to finalize the deal in March 2019, internal delays at ConvergeOne held up the closing until May 2019. (*Id*. ¶¶ 43–45.) ConvergeOne earned $17 million in sales revenue from the Westlake Expansion & Extension Deal. (*Id*. ¶¶ 45–46.)

### B.   Compensation Plans

#### 1.   2017 Plan

Between January 2017 and mid-May 2019, Hull's compensation was governed by the 2017 Variable Compensation Plan (the "2017 Plan"). (*Id*. ¶ 48; Murphy Decl. [Doc. No. 63], Ex. 1 (2017 Plan).) The 2017 Plan was a commission-based compensation plan for NAMs such as Hull. (Murphy Decl., Ex. 1 (2017 Plan) at 1.) It set forth the method by which ConvergeOne calculated commissions, stating, "Commissions are calculated under the Plan using a quota based system that pays a defined percentage of calculated Gross Margin on new business until quota is attained for the applicable category. Once quota is attained, escalators reward additional achievements." (*Id*. at 2.) Under the 2017 Plan, Hull earned commissions of 22% of the gross profit margin realized on the managed services that he sold to Westlake. (Second Am. Compl. ¶ 57.) Hull alleges the compensation structure of the 2017 Plan motivated him to craft the Westlake Expansion & Extension Deal with Westlake. (*Id*. ¶ 59.)

3

However, Hull contends that ConvergeOne has demonstrated a pattern of bad faith in its commission calculations. (*Id.* ¶ 227.) In fact, in December 2018, Hull sued ConvergeOne for its alleged failure to pay him earned commissions, as determined by the terms of the 2017 Plan, for his work on the Westlake Private Cloud Contract. (*Id.* ¶ 60.)

In early 2019, ConvergeOne announced a new compensation plan applicable to NAMs. (*Id.* ¶¶ 62, 67.) The company intended to implement it on July 1, 2019 and would disperse the first commissions under the plan on or about July 31, 2019. (*Id.*) At a February 2019 presentation regarding the new plan, ConvergeOne leadership stated that the changes in the new plan were "not a cost-cutting measure," and that NAMs would have the option to receive either "salary plus a % on [gross profit]" or "pay on paid [gross profit]." (*Id.* ¶ 64.) In addition, ConvergeOne leadership informed NAMs that the company would provide training on the new compensation plan between May and June 2019, prior to its implementation. (*Id.* ¶ 66.) Hull alleges that he relied on ConvergeOne's representations about the effective date of the new plan and worked diligently with Westlake to close the pending Expansion & Extension Deal so the 2017 Plan would apply to his commission. (*Id.* ¶ 68.)

In April 2019, Hull asked his sales director, Anthony Scialabba, for clarification about the new plan, including whether it would be more lucrative for a NAM to close a deal under it, versus the 2017 Plan. (*Id.* ¶ 69.) Responding via email, Scialabba told Hull that he would be paid "normally" under the current plan if he were to close on a deal prior to July 1, but would "be made whole back to dollar 1 once Escalators are accomplished."

(*Id.* ¶ 73.)  When Scialabba made these representations, Hull alleges, he knew that Hull was close to closing the Westlake Expansion & Extension Deal.  (*Id.* ¶ 74.)

### 2.   April Plan

On April 17, 2019, Scialabba sent Hull a new, nine-page compensation and commission plan, along with the request that he sign and return it by May 1, 2019.  (*Id.* ¶ 75.)  Although ConvergeOne had previously stated that the new plan would go into effect in July 2019, the effective date of the new plan that Scialabba sent Hull was April 1, 2019 (the "April Plan.").  (*Id.* ¶ 76.)  Among its provisions, the April Plan stated that NAMs would be "eligible to earn a commission of 10% paid monthly on gross profit collected during the previous month on ConvergeOne products and services sold by you."  (Murphy Decl., Ex. 2 (April Plan) at 1.)  In addition, the April Plan contained several tables and stated that ConvergeOne would pay commissions "based on the tables below generated by you each month, as measured by invoices on accounts in which you were actively engaged as a direct sales person or sales manager within your designated sales territory." (*Id.*)  Hull contends that ConvergeOne and Scialabba knew he reasonably believed the company would base commissions under the April Plan on actual margins, just as it had under the 2017 Plan.  (Second Am. Compl. ¶¶ 93–94.)

Hull further alleges that despite Converge One's earlier representations about providing training regarding the new plan, it failed to do so, and no one at the company responded to a number of his questions, including how the new plan would affect commissions related to the Westlake Expansion & Extension Deal. (*Id.* ¶¶ 92, 95–96.) Instead, when Hull was close to closing the deal, he alleges that ConvergeOne induced him

to sign the April Plan by leading him to believe that commissions under the April Plan would be based on actual margins. (*Id*. ¶¶ 97, 99.) Prior to signing, Hull approached Scialabba about the possibility of changing some of the language in the April Plan to clarify its impact on the Westlake Expansion & Extension Deal, but ConvergeOne refused to make any such changes. (*Id*. ¶¶ 100–01.) After several subsequent communications between Hull and Scialabba, Hull felt reassured that his commission on the Westlake Expansion & Extension Deal would not be disadvantaged if he signed the April Plan. (*Id*. ¶¶ 102–07.) Also based on those communications, Hull believed that ConvergeOne was acting in good faith, and that the timing and application of the April Plan would be uniform for all NAMs. (*Id*. ¶ 107.) In light of these reassurances, along with the earlier representation that the new plan was not a cost-cutting measure, Hull understood that his commission under the April Plan would be more profitable than under the 2017 Plan. (*Id*.) Consequently, he signed the April Plan on April 30, 2019. (*Id*.)

In May 2019, however, after hearing rumors that ConvergeOne did not intend to base NAMs' commissions on gross profit margins as set forth in the April Plan, Hull followed up with employees in ConvergeOne's finance department. (*Id*. ¶ 121.) The finance staff were unaware of the April Plan and believed the 2017 Plan governed Hull's compensation. (*Id*. ¶¶ 131–32.) In any event, ConvergeOne did not pay Hull the full first commission payment related to the Westlake Expansion & Extension Deal that he believed was due in June 2019. (*Id*. ¶ 133.) Adding to the confusion about which plan was in effect, during a July 2019 conference call, ConvergeOne President John Lyons announced that the

company would roll out "the new commission plan" in 2020, rather than on July 1, 2019, as he had previously stated.  (*Id*. ¶ 134.)

The following day, the company's finance department attempted to reconcile the monthly commissions due to Hull, purportedly calculating them under the terms of the April Plan, but they provided figures to Hull that were inconsistent with the terms of that plan. (*Id*. ¶ 136.)  Because the Westlake Expansion & Extension deal resulted in over $12.4 million in profit to Converge One, Hull asserts that under the terms of the April Plan, 30% of the gross profit margin would have resulted in a commission of approximately $3.8 million for his work on the deal.  (*Id*. ¶ 112–13.)  Under the terms of the 2017 Plan, Hull alleges he would have been entitled to a commission of approximately $2.7 million.  (*Id*. ¶ 119.)  On July 31, 2019, Scialabba informed Hull that the April Plan was "null and void," which he reiterated in an August 5, 2019 email.  (*Id*. ¶ 137.)

### 3.  September Plan

Shortly thereafter, ConvergeOne sent Hull a different commission plan to review and sign (the "September Plan"), representing that it would commence on September 1, 2019 and would replace the 2017 Plan.  (*Id*. ¶¶ 139–41.)  Under the terms of the September Plan, Hull would receive significantly reduced commissions.  (*Id*. ¶ 142.)  In a September 5, 2019 voicemail message, Scialabba demanded that Hull sign the September Plan, and acknowledged internal confusion as to which commission plan applied to Hull's commissions for the Westlake Expansion & Extension Deal, which, again, had closed in May 2019.  (*Id*. ¶¶ 147–48.)  Scialabba noted that it would be up to ConvergeOne to

determine which plan applied and that company leadership planned to meet the following day to discuss it.  (*Id*. ¶ 147.)

In November 2019, ConvergeOne leadership informed Hull that the company would apply the unsigned September Plan's commission terms, including an "imputed margin," to Hull's commission on the Westlake Expansion & Extension Deal, rather than the actual margin calculations it had applied in the past, under prior agreements.  (*Id*. ¶¶ 151, 154, 160.)

In late January 2020, Hull closed an additional deal with Westlake, the "User Addition" to Westlake's Private Cloud, resulting in $1.7 million in revenue for ConvergeOne, with a gross profit of $563,000 on a "Net-New" component that was not part of the Westlake Expansion & Extension Deal.  (*Id*. ¶¶ 168, 170.)  Hull alleges that a ConvergeOne Managed Services executive deliberately mischaracterized the transaction and the profit margins to show a gross profit of only $82,942.26 instead of $563,000.  (*Id*. ¶¶ 174–77.)  Consequently, Hull received a commission of only $21,000—an amount that he contends is deficient by more than $100,000 under the terms of both the 2017 Plan and the April Plan, and even deficient under subsequent unsigned plans between ConvergeOne and Hull.  (*Id*. ¶ 179.)

### C.    Plaintiff's Claims and Defendant's Motion to Dismiss

Hull commenced this litigation in March 2020 in Minnesota state court, and ConvergeOne removed the action to this Court shortly thereafter.  (Notice of Removal [Doc. No. 1].)  As noted earlier, pursuant to several statutory and common law causes of action, Hull seeks to recover unpaid sales commissions.  He contends that ConvergeOne

has paid him $287,174.03 in commissions related to the Westlake Expansion & Extension Deal. (Second Am. Compl. ¶ 195.) However, he alleges that under the terms of the 2017 Plan, ConvergeOne should have paid him a commission of approximately $2.5 million related to the original managed services that he sold as part of the Expansion & Extension Deal, and under the April Plan, if applicable, ConvergeOne should have paid him a commission of approximately $3.8 million. (*Id*. ¶¶ 119, 195, 197.)

Pursuant to Rule 12(b)(6), Defendant moves to dismiss all of Plaintiff's claims for the following reasons: (1) the Minnesota statutory wage claim fails because the statute does not apply extraterritorially and Hull lacks relevant contacts with Minnesota; (2) the Utah wage payment statute is inapplicable to wage claims arising out of employment agreements between the parties, as is the case here; (3) the breach of contract claim fails because the contracts in question were not enforceable; (4) the claim for negligent misrepresentation and omission fails because Hull fails to adequately plead causation and reliance; (5) the promissory estoppel claim is not supported by a sufficient allegation of detrimental reliance; and (6) the unjust enrichment claim is not sufficiently supported by allegations of illegal or unlawful conduct. (Def.'s Mem. [Doc. No. 62] at 1–2.)

## II.   DISCUSSION

### A.   Standard of Review

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, and views those allegations in the light most favorable to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal

conclusions couched as factual allegations. *Id.* To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

On a motion to dismiss, a district court may consider the complaint, exhibits attached to the complaint, and documents that are necessarily embraced by the complaint, without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Materials necessarily embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 998 (8th Cir. 2016) (citation omitted).

Here, in deciding the instant motion, the Court considers Defendant's two exhibits attached to the Declaration of Andrew B. Murphy. These exhibits consist of the 2017 Plan (Murphy Decl., Ex. 1) and the April Plan (*id.*, Ex. 2). Hull specifically refers to these documents throughout the Second Amended Complaint, and the parties do not question their authenticity. (Second Am. Compl. ¶¶ 48–59; 75–107.) They are thus "embraced by the pleadings." *Hughes*, 840 F.3d at 998.

### B. Minnesota Payment of Wages Act (Count I)

Hull alleges that ConvergeOne violated the MPWA by failing to pay his full commissions. (Second Am. Compl. ¶ 231.) Specifically, Hull contends that ConvergeOne:

10

(1) failed to provide sufficient information to determine the basis of the commission payments, Minn. Stat. § 181.032; (2) failed to pay the commissions owed, Minn. Stat. § 181.03; and (3) retaliated against him for asserting his rights under the MPWA, Minn. Stat. § 181.101.  (*Id*. at ¶¶ 236, 243, 246.)

ConvergeOne, however, argues that as a general matter, the MPWA does not apply to persons outside of Minnesota, and Hull has insufficient contacts with the state of Minnesota.  (Def.'s Mem. at 9–13.)  Moreover, even if the MPWA applies, ConvergeOne contends that Hull fails to state a viable claim for relief.  (*Id*. at 13–18.)

### 1.    Standing

 In order for a plaintiff to invoke the protections of the MPWA, he must first establish that he has standing to bring a claim.  *Rao v. St. Jude Med. S.C., Inc.*, No. 19-cv-923 (MJD/BRT), 2020 WL 4060670, at *2–3 (D. Minn. May 26, 2020).  Although ConvergeOne relies on Rule 12(b)(6) in support of its motion to dismiss, questions of standing generally implicate Rule 12(b)(1), which requires a plaintiff to demonstrate the existence of subject-matter jurisdiction.  *See V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000) ("The burden of proving subject matter jurisdiction falls on the plaintiff.").

As Defendant notes, under Minnesota law, "[t]here is a general presumption that Minnesota statutes do not apply extraterritorially."  *Cruz v. Lawson Software, Inc*., No. 08-CV-5900 (MJD/JSM), 2009 WL 10711629, at *5 (D. Minn. May 21, 2009) (citing *In re Pratt*, 18 N.W.2d 147, 153 (Minn. 1945)).  In order to overcome this presumption and apply a statute extraterritorially, the Minnesota Legislature must explicitly state that it

intends for a law to have extraterritorial effect. *Rao*, 2020 WL 4060670, at *3. The plain language of the MPWA contains no such express language extending its application to out-of-state workers. To the contrary, it contains language "that indicates the legislature's intent to have the statute apply only to employees working within Minnesota." *Id*. Specifically, it provides that "[w]hen any person, firm, company, association, or corporation *employing a commission salesperson in this state* terminates the salesperson, or when the salesperson resigns that position, the employer shall promptly pay the salesperson[.] Minn. Stat. § 181.145, subd. 2 (emphasis added). The MPWA further states that "[w]hen any employer *employing labor within this state* discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee." *Id*. § 181.13(a) (emphasis added).

This language contemplates that the MPWA extends only to employees who are employed in Minnesota. And when this language is considered in conjunction with the presumption against extraterritorial effect, the Court concludes that employees who are not "working in Minnesota" do not qualify for the protections afforded by the MPWA. *See Rao*, 2020 WL 4060670, at *4 (holding that MPWA does not extend to a plaintiff who neither lived nor worked in Minnesota); *Cruz*, 2009 WL 10711629, at *6 (finding the MFLSA does not apply to a plaintiff who is not a Minnesota resident and has neither lived nor worked in the state); *Arnold v. Cargill, Inc.*, No. 01-cv-2086 (DWF/AJB), 2002 WL 1576141, at *4 (D. Minn. July 15, 2002) (dismissing MHRA claims filed by plaintiffs

whose only connection to Minnesota was that the defendant's headquarters were located in the state and the allegedly discriminatory policies "emanated" from Minnesota).

### a.    Minnesota Employee Status

Because the parties do not dispute that Hull is not a Minnesota resident, the question of his standing turns on whether he "works in Minnesota." ConvergeOne argues that Hull fails to allege sufficient contacts with Minnesota to show that he works in Minnesota. (Def.'s Mem. at 12.)   It contends that Plaintiff merely relies on allegations that ConvergeOne's headquarters are in Minnesota and that a number of ConvergeOne's employees work and perform their typical duties in the state. (*Id.*)

Indeed, if those were the sole bases for Hull's Minnesota contacts, he could not establish standing. *See Arnold*, 2002 WL 1576141, at *4 (dismissing MHRA claims filed by plaintiffs whose only connection to Minnesota was that the defendant's headquarters were located in the state and the allegedly discriminatory policies "emanated" from Minnesota). But ConvergeOne overlooks Hull's additional allegations that he attended a four-day mandatory training session in Minnesota, that he receives ongoing guidance, supervision, and direction from his Minnesota supervisors, and that he regularly attends virtual meetings and conference calls with colleagues in Minnesota. (Second Am. Compl. ¶¶ 10–26.)   These allegations are similar to those in *Wilson v. CFMOTO Powersports, Inc.*, No. 15-cv-3192 (JRT/JJK), 2016 U.S. Dist. LEXIS 28975, at *17–22 (D. Minn. Mar. 7, 2016), involving a claim arising under the Minnesota Human Rights Act ("MHRA"), which, like the MPWA, contains no express provision extending its application beyond the borders of the state. In *Wilson*, the plaintiff alleged that he had attended in-state trainings,

reported directly to and received instruction from Minnesota supervisors, communicated with Minnesota employees on a daily basis, and would have returned to Minnesota for future training sessions had he not been terminated. *Id*. While the court characterized its decision as "a close call," it found such allegations sufficient to withstand the defendant's motion to dismiss based on the plaintiff's Minnesota contacts. *Id*. at *19–21; *cf. Zarling v. Abbott Labs*, No. 21-cv-23 (MJD/BRT), 2021 WL 2551438, at *4 (D. Minn. June 22, 2021) (distinguishing *Wilson* and finding that plaintiff did not "work in Minnesota" for purposes of MHRA since "[h]is work never required him to be in Minnesota; he attended no training in Minnesota; he incurred no work expenses in Minnesota; [] he had no managers or clients in Minnesota[;] [and] [h]e suffered no discrimination or other liable conduct by [defendant] while in Minnesota."). Here, Plaintiff's allegations of ongoing and continuous contacts through his work with ConvergeOne in Minnesota are similar to those in *Wilson*, and when taken as true, provide a sufficient basis for Hull's standing under the MPWA and the application of the statute to these facts.

In sum, the Court finds that Hull has pleaded facts sufficient to survive dismissal based on the reach of the MPWA and Hull's Minnesota contacts. As the court noted in *Wilson*, discovery in this case may ultimately call Hull's standing into question, but for purposes of the instant motion, his allegations are sufficient. 2016 U.S. Dist. LEXIS 28975, at *21–22 (noting that discovery might show that the plaintiff did not attend training sessions in Minnesota, would not have attended future training sessions in the state, or did not communicate with Minnesota employees as he had alleged).

2.      **Failure to State a Claim**

ConvergeOne asserts that even if the MPWA applies, Hull has failed to plead the statutory prerequisites necessary to state a claim for relief under the statute. (Def.'s Mem. at 13–18.)

a.      **Insufficient Basis to Determine Commissions – Minn. Stat. § 181.032**

Hull alleges that ConvergeOne has violated the MPWA, Minn. Stat. § 181.032, by failing to "adequately state the basis of the commissions payments and omitting relevant information regarding the gross and net margins actually achieved, upon which much of the commissions are based." (Second Am. Compl. ¶¶ 243–45.) ConvergeOne argues that this claim fails because the statute does not require employers to provide this level of specificity. (Def.'s Mem. at 13.) Rather, ConvergeOne contends, the statute only requires an employer to provide an earnings statement that indicates the general "basis," or foundation, of an employee's pay. (*Id*. at 13–14.)

Section 181.032 requires employers to provide their employees with an earnings statement at the end of each pay period that includes, among other things "the rate or rates of pay and basis thereof, including whether the employee is paid by hour, shift, day, week, salary, piece, commission, or other method." Minn. Stat. § 181.032(a) & (b)(2). While payment by commission is "included" as an example of the "basis" for an employee's rate or pay, the statute does not expressly state whether additional information—such as the method used to determine commission payments—must be disclosed as part of the "basis" for an employee's commission-based pay.

The Court finds that "basis," as used in § 181.032, is unclear, since it could refer only to the general type of payment, i.e., hourly pay, salary, commissions, etc., or it could also refer to the formula used to determine commissions or pay. *See Christianson v. Henke*, 831 N.W.2d 532, 537 (Minn. 2013) ("A statute is only ambiguous if its language is subject to more than one reasonable interpretation."). The Court is unaware of any cases that have addressed the meaning of "basis" in Minn. Stat. § 181.032. When a statute is unclear or ambiguous, courts must "go beyond the plain language of the statute to determine the intent of the legislature." *Rohmiller v. Hart*, 811 N.W.2d 585, 589 (Minn. 2012).

Defendant properly observes that when the words of a Minnesota law are not explicit, legislative intent may be informed by legislative and administrative interpretations of the statute. (Def.'s Mem. at 14) (citing Minn. Stat. § 645.16(8)). ConvergeOne therefore directs the Court to the website of the Minnesota Department of Labor and Industry ("DLI"), in which the agency provides a sample employee notice form that purportedly meets the requirements of the MPWA.[1] (Def.'s Mem. at 14–15.) Paragraph 4 of the sample notice provides a blank space for the employer to indicate the "rate or rates of pay," and then provides a series of boxes to check, indicating the basis for pay, which includes a box for "commission." *Minn. Dep't of Labor & Indus.*, *For Business, Employee Notice*,

---

[1]    Defendant notes that although the sample form is governed by § 181.032(d) rather than § 181.03(b), which is at issue here, both provisions require employers to state "the rate or rates of pay and basis thereof." (Def.'s Mem. at 15 n.4) (citing Minn. Stat. §§ 181.032(b)(2), 181.032(d)(1)).

*Employee Notice Example*, https://www.dli.mn.gov/sites/default/files/pdf/employee_ notice_form.pdf (last visited Nov. 8, 2021).

ConvergeOne contends that the sample notice constitutes an administrative interpretation of the statute, and that under DLI's "interpretation," it is sufficient for an employer to simply inform an employee that pay is on a commission basis, without elaboration. (Def.'s Mem. at 14–15.) The Court notes that the language on the sample notice, however, simply asks employers to indicate the "rate or rates of pay" by checking a box, whereas Minn. Stat. § 181.03(b)(2) requires employers to disclose "the rate or rates of pay *and basis thereof*."

ConvergeOne ignores other potential interpretative guidance on DLI's website, including a summary of "Minnesota's employee notice law," which cross-references the sample notice discussed above and describes the "[i]nformation required for employee notice" at the start of employment and any time the employer effects a change in the rate of pay, for example. *Minn. Dep't of Labor & Indus., For Business, Employee Notice, View/Print Flyer: Minnesota's Employee Notice Law*, https://dli.mn.gov/sites/default/ files/pdf/about_employee_notice.pdf (last visited Nov. 8, 2021). DLI's summary of the notice requirement states that employers must disclose the following information to their employees: "Employee's rate or rates of pay, including whether the employee is paid by the hour, shift, day, week, salary, piece, commission or other method, *and when and how these rates apply*." *Id.* (emphasis added). This guidance suggests that an employer must provide at least some information regarding "how" it determines rates of pay or commissions.

The Court finds that to the extent the information on the DLI's website may be considered an "administrative interpretation" of the MPWA, the information is unclear and does not meaningfully illuminate legislative intent.

Courts may also consider "the mischief to be remedied" by a statute when attempting to ascertain the legislative intent behind non-explicit statutory language. Minn. Stat. § 645.16(3). The Minnesota Legislature approved the current version of Minn. Stat. § 181.032 in a bill to prevent "wage theft." *Minn. Dep't of Labor & Indus., For Business, Employment Practices, Wage Theft Law, Minn. Wage Theft Prevention Act*, https://www.dli.mn.gov/sites/default/files/pdf/Wage_theft_legislation_2019_Article3_Se ssionLawChap7%20(6).pdf (last visited Nov. 8, 2021). Various actions by an employer, when committed with "intent to defraud," may constitute wage theft, including the "fail[ure] to pay an employee all wages, salary, gratuities, earnings, or commissions as required by federal, state, or local law." Minn. Stat. § 609.52, subd. 1(13). The particular "mischief to be remedied" by § 181.032 is an employer's failure to disclose to employees the rate of pay and basis for pay. Hull alleges that ConvergeOne failed to provide sufficient information to determine the basis upon which it calculated his commissions, in violation of the MPWA. (Second Am. Compl. ¶¶ 213–27, 243–45.) Specifically, he alleges that ConvergeOne has failed to explain the basis for his commissions relating to the Westlake Expansion & Extension Deal, (*id.* ¶¶ 138, 178, 213–14, 243–45), and has provided consistently confusing and inaccurate earnings statements. (*Id*. ¶ 214.) Particularly given this context, the Court finds that Hull's allegations fall within the scope of the statute. Defendant's Motion to Dismiss is therefore denied in this regard.

### b.     Failure to Pay Commissions Owed – Minn. Stat. § 181.101

Minnesota Statutes § 181.101 provides that "every employer must pay all wages earned by an employee at least once every 31 days and all commissions earned by an employee at least once every three months, on a regular payday." Minn. Stat. § 181.101(a). The provision provides "a substantive right for employees to the payment of wages, including salary, earnings, and gratuities, as well as commissions, in addition to the right to be paid at certain times." *Id.*  In addition, the statute authorizes the DLI Commissioner to demand payment of unpaid commissions from an employer on the employee's behalf, and sets forth the procedure by which the Commissioner may do so. *Id.*  The statute also permits the Commissioner to impose penalties for an employer's refusal to pay.  *Id*. However, the Commissioner's authority to collect payment and impose penalties "does not prevent an employee from prosecuting a claim for wages." *Id*.

Hull alleges that ConvergeOne has violated this statute by failing to promptly pay his earned commissions in full.  (Second Am. Compl. ¶¶ 232–36.)  He acknowledges that he has filed a complaint with the Minnesota DLI concerning the unpaid commissions, and the agency has not taken action, but asserts that this does not preclude him from pursuing a legal remedy.  (*Id*. ¶¶ 237–41.)

In the instant motion, ConvergeOne argues that Hull's claim fails because it does not allege all of the "necessary elements" for a claim under § 181.101, namely, that it fails to allege the DLI made a claim for payment that went unpaid.  (Def.'s Mem. at 17.)

The Court disagrees with ConvergeOne, as the statute clearly gives employees a substantive right to bring a private action in response to a wage dispute, regardless of any

action or inaction by the DLI.  Minn. Stat. § 181.101(a) (addressing Commissioner's authority to demand payment and impose penalties, and stating, "This section does not prevent an employee from prosecuting a claim for wages," and, "This section provides a substantive right for employees to the payment of wages, including . . . commissions[.]"). While the ability to enforce a *penalty* is limited to the DLI, with any collected funds going to the employee, *id.*, Hull does not allege that he is entitled to collect a penalty.  Therefore, the Court finds that he has sufficiently alleged a claim for the violation of Minn. Stat. § 181.101, and Defendant's motion is denied on this basis.

### c.        Retaliation – Minn. Stat. § 181.03

Plaintiff's final MPWA claim arises under Minn. Stat. § 181.03, which prohibits retaliation against employees for asserting rights or remedies under the statute.  Minn. Stat. § 181.03, subd. 6.  Hull alleges the following acts of retaliation:  (1) In the course of discussions among Converge One leadership about Hull's disputed commission payments, ConvergeOne's general counsel frequently referred to Hull's prior lawsuit against ConvergeOne regarding commission payments (Second Am. Compl. ¶ 249); (2) ConvergeOne has continuously changed Hull's compensation terms to his detriment in retaliation for his prior lawsuit and for his demands for commission payments on the Westlake Expansion & Extension Deal (*id.* ¶ 250); (3) although ConvergeOne has acknowledged it owes Hull some of the commissions sought in this action, it has retaliated against him by refusing to pay them (*id.* ¶ 251); (4) ConvergeOne has refused to pay Hull's commissions unless he releases any claims for commissions above the amounts that ConvergeOne states are due (*id.* ¶ 252); and (5) as a result of Hull's actions to obtain past-

due commissions, his manager has imposed additional reporting requirements upon him to make his job more burdensome. (*Id*. ¶ 253.)

Defendant moves to dismiss Hull's MPWA retaliation claim, arguing that he fails to allege retaliatory conduct, and merely engages in "circular reasoning" by asserting that ConvergeOne failed to pay him, he demanded payment, and ConvergeOne has still not paid him. (Def.'s Mem. at 15.)

As ConvergeOne observes, the MPWA does not identify the elements of a retaliation claim. However, courts addressing retaliation claims generally require plaintiffs to allege an adverse employment action that is causally related to protected activity, *see, e.g., Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 n.8 (8th Cir. 2006), and the adverse action must generally involve a "tangible change in working conditions that produces a material employment disadvantage." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015). "Cuts in pay or benefits" constitute such a change. *Id.* (citing *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)).

Plaintiff's allegations meet this standard. As noted, he alleges that he earned certain commission payments and subsequently requested payment. (Second Am. Compl. ¶ 138.) He further asserts that ConvergeOne disputed the amount and agreed to pay only a portion of the requested commission under the condition that Hull waive any legal claims involving the commission. (*Id.* ¶ 165.) Viewing the pleadings in the light most favorable to Plaintiff, this allegation describes an action akin to a "cut in pay," which constitutes an adverse employment action. *Wagner*, 779 F.3d at 767. And Hull further alleges that ConvergeOne's conduct in this regard is causally related to his previous lawsuit, of which

ConvergeOne was aware.  (Second Am. Compl. ¶¶ 249–50.)  In related contexts involving retaliation claims, courts have found that the filing of a lawsuit is a protected activity.[2]  *See, e.g., Haynes v. Stephenson*, 588 F.3d 1152, 1155–56 (8th Cir. 2009) (filing of prison grievance, which is "like the filing of an inmate lawsuit, is protected First Amendment activity" for purposes of § 1983 retaliation claim); *Greenwood v. Ross*, 778 F.2d 448, 457 (8th Cir. 1985) (filing of EEOC charge and civil rights lawsuit are protected activities for purposes of § 1983 retaliation claim).

Accordingly, for all of the foregoing reasons, the Court finds that Hull plausibly alleges a retaliation claim in violation of Minn. Stat. § 181.03.  ConvergeOne's Motion to Dismiss is therefore denied with respect to this claim.

### C.    Utah Payment of Wages Act (Count II)

Similar to the MPWA, the Utah Payment of Wages Act ("UPWA) calls for the regular payment of wages, Utah Code § 34-28-3, and prohibits retaliation against an employee "in the terms, privileges, or conditions of employment." *Id*. § 34-28-19.

Because Hull is a Utah resident, his claim under the UPWA is asserted in the alternative to his MPWA claim.  (*See* Second Am. Compl. at 37.)  Hull alleges that ConvergeOne violated the UPWA by failing to pay his commissions in full and by

---

[2]    Because Hull's allegations regarding Defendant's failure to pay commission payments sufficiently allege an adverse action, the Court declines to address Defendant's arguments regarding whether Hull's other allegations, such as changed reporting requirements, constitute an adverse action.

retaliating against him after he threatened to take legal action against ConvergeOne. (*Id.* ¶¶ 263–78.)

ConvergeOne moves to dismiss, arguing that the UPWA is inapplicable to cases governed by contractual agreements, such as the commission plans here. (Def.'s Mem. at 18–21.) Even if the statute applies, ConvergeOne contends that Hull's UPWA retaliation claim fails because the statute only confers a private right of action for wage claims, not retaliation claims. (*Id.* at 21–24.) And, on the merits, ConvergeOne asserts that the UPWA retaliation claim fails because Hull does not sufficiently allege causation and an adverse action. (*Id.* at 21, 24.)

### 1. Employment Agreement

Section 34-28-3 of the UPWA requires employers to "pay the wages earned by an employee at regular intervals," and to "pay for services rendered during a pay period within ten days after the close of that pay period." Utah Code § 34-28-3(1)(a)–(b). It defines "wages" as "the amounts due the employee for labor or services, whether the amount is fixed or ascertained on a time, task, piece, commission basis or other method of calculating such amount." *Id.* § 34-28-2(1)(i). However, the introductory section to Chapter 28 of the UPWA limits its scope, stating that none of its provisions shall apply to state, county, municipal, agricultural, and household domestic workers, "or to any other employment *where an agreement exists* between employer and employee providing for different terms of payment." *Id.* § 34-28-1 (emphasis added). The Utah Supreme Court addressed this broad exclusion in *Action Electric Co. v. Industrial Commission of Utah*, 636 P.2d 474, 475 (Utah 1981), in which an employee, subject to an employment contract that specified

23

his base salary, challenged the rate of his salary under the UPWA.  Citing Utah Code § 34-28-1, the Utah Supreme Court found the UPWA inapplicable "because the employee in this case had an individual employment agreement." *Id*. at 477.  The court explained, "The [UPWA] is apparently aimed at helping those whose employment contracts are silent on its subject matter.  It is expressly inapplicable to "employment where an agreement exists between employer and employee providing for different terms of payment[.]"  *Id.* at 475. In short, the court found that Chapter 28 "imposes no duty pertaining to the rate of wages that shall be paid, which is the sole issue in this case," and is also inapplicable where the employee has an individual employment agreement.  *Id.* at 477.

ConvergeOne relies on *Action Electric* in support of its motion to dismiss, noting that Hull's wage-related claim under the UPWA concerns his rate of pay and he alleges the existence of agreements that address the terms of his compensation.  (Def.'s Mem. at 18–19.)  In response, Hull argues that *Action Electric*'s discussion about employment contracts is mere dicta, citing *Zoll & Branch, P.C. v. Asay*, 932 P.2d 592, 594 n.3 (Utah 1997).  (Pl.'s Opp'n [Doc. No. 69] at 33–34.)

But the court does not read *Zoll* in the same way as Hull.  *Zoll* addressed a different provision of the UPWA, Utah Code § 34-28-5, which concerns the imposition of penalties on employers who fail to pay wages upon an employee's separation.  The *Zoll* court took issue with *Action Electric*'s characterization of § 34-28-5 as a provision requiring the prompt payment of wages "upon voluntary or involuntary severance." 932 P.2d at 594 n.3 (citing *Action Elec.*, 636 P.2d at 475). The *Zoll* court found that § 34-28-5 applied only to employees who were involuntarily separated from their employment.  *Id*. at 595.  Indeed,

24

characterizing *Action Electric*'s passing reference to § 34-28-5 as dicta is accurate, since none of the claims in *Action Electric* arose under that portion of the UPWA. However, it was not dicta for *Action Electric* to conclude that Chapter 28 did not apply to a claim challenging the rate of pay where the employee also had an individual employment agreement—those issues were squarely before the court. *Action Electric* remains the sole decision of the Utah Supreme Court to address whether the UPWA applies in this context.

In support of Hull's argument that the commission agreements do not foreclose his UPWA claim, he identifies three Utah cases involving UPWA claims brought by plaintiffs with employment agreements. (Pl.'s Mem. at 32–33) (citing *Martinez-Trumm v. Citywide Home Loans*, No. 2:18CV103DAK, 2018 WL 3037395, at *1 (D. Utah June 19, 2018); *Grimm v. DxNA LLC*, 427 P.3d 571, 577 (Utah Ct. App. 2018); *Velez v. Robert J. Debry & Assocs., PC*, 343 P.3d 324, 325 (Utah Ct. App. 2015)). He argues that these cases indirectly bolster his position because even though the courts ultimately dismissed the plaintiffs' UPWA claims, they did so on other bases, and not because an employment agreement precluded relief under the statute. (*Id.*) (citing *Martinez-Trumm*, 2018 WL 3037395, at *1 (finding UPWA inapplicable to a change in the terms of employment, and even if it applied, employee's UPWA claim failed because employee consented in writing to a change in her commission rate); *Grimm*, 427 P.3d at 577 (holding that plaintiff's UPWA claim failed because plaintiff did not satisfy requirement for written, immediate demand of wages upon termination); *Velez*, 343 P.3d at 325 (dismissing claim where plaintiff with employment agreement asserted UPWA claim against employer, but failed to pursue it in arbitration, as required by agreement)). The Court does not find these cases

particularly persuasive, as they do not address the question of whether the UPWA applies in the presence of an employment agreement.

However, in *Van Dyke v. Liberty Press, LLC*, No. 100107272, 2013 WL 5288462, at *7–8 (Utah Dist. Ct. Aug. 12, 2014), a state trial court in Utah directly addressed the issue. Relying on *Action Electric* and the language of Utah Code § 34-28-1, the court found that provisions of the UPWA do not apply to employers and employees with agreements in place for the payment of wages. *Id.* For employees who have no such agreements, the UPWA functions as a "default" wage agreement. *Id.* at *8. The court therefore concluded that the parties "had an agreement in place which provided for the terms of payment. This included a definition of commissions, how they were calculated, and when they were paid. Hence, the [UPWA] has no application to these facts. [Plaintiff's] claims for lost commissions under this Act must fail." *Id.*

The Court finds that the language of § 34-28-1 controls, and *Action Electric* and *Van Dyke* provide direct interpretations of that language. Consistent with this authority, which includes the only guidance from the Utah Supreme Court on the issue, because Hull's UPWA claim is predicated upon the commission agreements and the calculation of commission, (*see, e.g.,* Second Am. Compl. ¶¶ 194–98, 268, 280–82), and the UPWA is inapplicable where an agreement governs the rate of payment, the Court finds the UPWA is inapplicable to Hull's UPWA claim. His claim is therefore dismissed with prejudice.

### 2. Retaliation – Utah Code Ann. § 34-28-19

As noted, Hull also asserts a retaliation claim under the UPWA, (*id.* ¶¶ 263-78), which ConvergeOne moves to dismiss. (Def.'s Mem. at 21–24.) ConvergeOne argues that

the claim fails because there is no private right of action for retaliation under the statute, and Hull fails to sufficiently plead an adverse employment action. (*Id.*)

Even if Hull's retaliation claim under the UPWA is not precluded for the reasons set forth above regarding his wage claim, the UPWA does not provide a private right of action for retaliation claims. Although § 34-28-9.5 provides a private right of action for *wage* claims, it does not address retaliation claims. Hull notes that amended language in the statute permits employees to sue directly if their wage claim exceeds $10,000, or if their wage claim is less than $10,000 and the employee asserts one or more "additional claims" against the employer. Utah Code § 34-28.9.5(2)(a)-(b). This language, however, speaks of "wage claims" as the vehicle for private litigation and does not identify retaliation as one of the other claims. Because Hull cannot bring a retaliation claim under the statute, the Court need not address whether he sufficiently pleads an adverse action. The Court therefore finds that Hull fails to state a claim for retaliation under the UPWA and his claim is dismissed with prejudice.

### D.   Controlling Law for Common Law Claims

An initial inquiry relevant to all of Plaintiff's common law claims concerns whether to apply Minnesota or Utah law. In deciding conflict of law questions, a federal district court sitting in Minnesota applies Minnesota's conflict of law rules. *See Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 65, 134 S. Ct. 568, 582 (2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Minnesota's choice-of-law analysis for substantive law, courts first consider whether there is an actual conflict between the law of two states. *State Farm Mut. Auto. Ins. Co. v. Great*

*W. Cas. Co.*, 623 N.W.2d 894, 896 (Minn. 2001) (citing *Myers v. Gov't Emp. Ins. Co.*, 225 N.W.2d 238, 241 (Minn. 1974)).  Where the relevant law is the same in both states, the Court need not perform a choice-of-law analysis.  *Merry v. Prestige Cap. Markets, Ltd.*, 944 F. Supp. 2d 702, 713 (D. Minn. 2013).

Here, the Court applies Minnesota law to Hull's common law claims because Minnesota and Utah law are substantially the same regarding the elements for breach of contract, c*ompare Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014), *with Am. W. Bank Members, L.C. v. Utah*, 342 P.3d 224, 230 (Utah 2014), negligent misrepresentation, *Hardin Cnty. Sav. Bank v. Hous. & Redev. Auth. of Brainerd*, 821 N.W.2d 184, 192 (Minn. 2012), *with Smith v. Frandsen*, 94 P.3d 919, 922 (Utah 2004), promissory estoppel, *compare Hous. & Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 336 (Minn. 2005), *with J.R. Simplot Co. v. Sales King Int'l, Inc.*, 17 P.3d 1100, 1107 (Utah 2000), and unjust enrichment, *compare Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. App. 2007), with *U.S. Fidelity v. U.S. Sports Specialty*, 270 P.3d 464, 468 (Utah 2012).  Moreover, the parties appear to agree that Minnesota law may be applied to Plaintiff's common law claims.  (Def.'s Mem. at 25, n.9; *see also* Pl.'s Opp'n at 37–55 (applying Minnesota law).)

### E.      Breach of Contract (Count III)

In his breach of contract claim, Hull alleges that he entered into valid and enforceable contracts with ConvergeOne regarding his commission payments. (Second Am. Compl. ¶ 280.)  He contends that he fulfilled his obligations under those agreements by making sales, and after he closed the sales deals, ConvergeOne breached the

compensation agreements by refusing to pay him his commissions, as calculated under the agreements. (*Id*. ¶¶ 281–283.) Further, Hull contends that ConvergeOne tried to retroactively alter the terms of the agreements, in bad faith, to Hull's detriment. (*Id*. ¶ 284.) Finally, he alleges that even under ConvergeOne's retroactive application of the September Plan, through which it calculated a $297,000 commission, it has still failed to pay him that amount. (*Id*. ¶ 285.)

ConvergeOne argues that dismissal of this claim is appropriate because the terms of the 2017 Plan and the April Plan were not sufficiently definite so as to create enforceable unilateral contracts. (Def.'s Mem. at 30–31.)

As an initial matter, the parties dispute whether the commission plans in question were bilateral or unilateral contracts. Because ConvergeOne contends that the plans are unenforceable unilateral contracts and moves to dismiss on this basis, for purposes of this motion, the Court examines whether Hull's allegations sufficiently plead the requirements for unilateral contracts. Under Minnesota law, a unilateral contract requires: (1) an offer definite in form; (2) communication of the offer; (3) acceptance; and (4) consideration. *Neb. Beef, Ltd. v. Wells Fargo Bus. Credit, Inc.*, 470 F.3d 1249, 1251 (8th Cir. 2006) (citing *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 742 (Minn. 2000)). "An offer must contain sufficiently definite terms to enable the fact-finder to interpret and apply them." *Id.* The determination of whether an offer is sufficiently definite "is an objective consideration determined by the outward manifestations of the parties." *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn. 1983).

In the employment context, a binding unilateral contract is formed when an employer makes a promise of employment on particular terms in the form of an offer and the employee accepts the offer. *Id.* "Payment of a commission is a term of employment subject to the provisions of the unilateral contract between the employee and employer." *Friedenfeld v. Winthrop Res. Corp.*, Nos. C5-02-1606, C4-02-1659, 2003 WL 1908112, at *2 (Minn. Ct. App. Apr. 22, 2003) (citing *Brown v. Tonka Corp.*, 519 N.W.2d 474, 477 n.1 (Minn. Ct. App. 1994)); *see also Fiebelkorn v. IKON Office Sols., Inc.*, 668 F. Supp. 2d 1178, 1184 ([T]o the extent Fiebelkorn claims that commissions were wrongly calculated and he was underpaid during his employment, he had only one option: sue for breach of the Plan.").

ConvergeOne contends that the 2017 Plan and the April Plan are unilateral contracts, in which it: (1) reserved the right to amend or modify the plans at any time, and (2) retained the authority to make binding, conclusive calculations of sales commissions. (Def.'s Mem. at 30–31.) These provisions, it argues, rendered its "offer" to calculate and pay commissions according to particular methodologies an indefinite promise that was not sufficiently binding to form an enforceable contract. (*Id.*) (citing *Grenier v. Air Express Int'l Corp.*, 132 F. Supp. 2d 1198, 1201 (D. Minn. 2001); *Rakos v. Skytel Corp.*, 954 F. Supp. 1234 (N.D. Ill. 1996)).

The cases on which ConvergeOne relies do not support its position under the facts alleged here. In *Grenier*, 132 F. Supp. 2d at 1201, the court examined a sales incentive plan that governed the payment of bonuses for "new business." Because the sales plan did not define "new business," and the employer retained the complete discretion to define the

term and thus determine the employee's right to bonuses, the court found the plan's plain language "unambiguously vest[ed] discretion in the defendant to determine what qualifie[d] as 'new business.'" *Id.* Accordingly, the court concluded that this discretion precluded the manifestation of a binding offer for any bonuses. *Id.* Similarly, in *Rakos*, 954 F. Supp. at 1238, a decision from the Northern District of Illinois, applying Illinois state law to a contract regarding bonus payments, the court found that a contract in which the employer retained discretion to cancel at any time and for any reason, did not constitute a definite offer of a "right" to bonus payments. *Id.* In both of these cases, it was the specific "reservation of discretion" under the particular facts presented that "precluded[d] the manifestation of a binding offer." *See Bahr v. Tech. Consumer Prods., Inc.*, 601 Fed. App'x 359, 366 (6th Cir. 2015) (citing *Grenier*, 132 F. Supp. 2d at 1201). It was not "merely that *any* discretion to affect the terms of the offer was reserved by the companies." *Id.* (emphasis added); *see also Feges v. Perkins Rests., Inc.*, 483 N.W.2d 701, 708 (Minn. 1992) (stating that "a mere reservation of the right to amend or modify [a] handbook" does not prevent its sufficiently definite provisions from forming the basis of a legally enforceable contract).

The allegations here are unlike those in *Grenier* and *Rakos*. Instead, they are similar to those in *Bley v. ClickShip Direct, Inc.,* No. 01-661 (MJD/SRN), 2001 WL 1640093, at *2 (D. Minn. Dec. 12, 2001), and *Bahr*, 601 Fed. App'x at 366, both of which involved the application of Minnesota law to employee incentive plans. In *Bley*, the court found *Grenier* inapplicable because the terms of the incentive program in question were definite and identified the "specific criteria to measure the accomplishment of each employee." 2001

WL 1640093, at *2.  Furthermore, the fact that the employer retained the discretion to amend or terminate the plan was not dispositive, particularly as the plaintiff had alleged bad faith.  *Id*.

In *Bahr*, 601 Fed. App'x at 366–67, the Sixth Circuit Court of Appeals applied Minnesota law, including *Bley*, to a sales bonus plan, construing it as an enforceable unilateral contract.  The court found the bonus plan contained a sufficiently definite offer that set forth the percentage of base salary that would be paid for meeting performance objectives.  *Id.*  In addition, the employer's objective manifestations of its intent to be bound, which included the requirement that the employer's CFO approve the plan and the precision of the plan's bonus matrix, supported the conclusion that the bonus plan was a sufficiently definite offer.  *Id.*  In the face of such facts, terms and conditions that reserved discretion to the employer to amend, change, or cancel the bonus plan did not "sufficiently mitigate against the clarity of the offer to prevent the formation of a contract under Minnesota law."  *Id.* at 367 n.2.

Similar to *Bley* and *Bahr*, here, the 2017 Plan and the April Plan described how commissions were to be calculated, both in text and table form, and the criteria used to determine eligibility.  (*See, e.g.*, Murphy Decl., Ex. 1 (2017 Plan) at 2 ("Commissions are calculated under the Plan using a quota based system that pays a defined percentage of calculated Gross Margin on new business until quota is attained for the applicable category."); Murphy Decl., Ex. 2 (April Plan) at 1 ("The Company will pay commissions based on the tables below generated by you each month, as measured by invoices on accounts in which you were actively engaged as a direct sales person or sales manager

within your designated territory."). As in *Bahr*, 601 Fed. App'x at 366–67, ConvergeOne uses "specific criteria to measure the accomplishment of each employee." (quoting *Bley*, 2001 WL 1640093, at *1). Also, ConvergeOne's objective manifestations of intent support the finding of an enforceable contract, as ConvergeOne pressured Hull to sign the April Plan, (Second Am. Compl. ¶ 97), and the precision of the commission tables reflects ConvergeOne's intent to be bound to the agreements by tying sales (whether in dollar figures or margins) to commissions. *Bahr*, 601 Fed. App'x at 366–67.

Nor is the Court persuaded that ConvergeOne's general reservation of the right to modification rendered its offers too indefinite. As noted in *Bahr*, the Minnesota Supreme Court has "unequivocally held that the absolute reservation of discretion to revoke an employment plan or policy does not in itself make the offers contained within indefinite." 601 Fed. App'x at 367 (citing *Feges*, 483 N.W.2d at 708). And, as in *Bley*, 2001 1640093, at *2, not only are the terms of the commission plans specific, Plaintiff has alleged ConvergeOne's bad faith in attempting to alter them. (Second Am. Compl. ¶ 284.)

Moreover, while the 2017 Plan grants ConvergeOne the discretion to modify the plan "with or without prior notice," it requires any such modifications to be "in [] writing signed by the President of the Company." (Murphy Decl., Ex. 1 (2017 Plan) at 4.) Plaintiff does not allege that Defendant modified the 2017 Plan in writing, signed by ConvergeOne's president. And the April Plan required ConvergeOne to give notice of any amendments to the plan. (Murphy Decl., Ex. 2 (April Plan) at 9.)

For all of these reasons, the Court finds that Hull has sufficiently stated a claim for breach of contract. ConvergeOne's motion is therefore denied with respect to this claim.

F.      **Negligent Misrepresentation (Count IV)**

Hull alleges that ConvergeOne made the following negligent misrepresentations or omissions to him:  (1) at a February 2019 presentation, ConvergeOne's executive officer stated that the company's upcoming commission plan would be based on gross profit margins (Second Am. Compl. ¶ 290); (2) in April 2019, Scialabba informed Hull that his commission for the Westlake Expansion & Extension Deal would be paid under the 2017 Plan, even though the company actually intended to use the April Plan (*id*. ¶ 291); (3) ConvergeOne's leadership and management purposely omitted and withheld material information about the April Plan so that Hull would sign it before the Westlake Expansion & Extension Deal closed (*id*. ¶ 298); (4) Hull's manager assured him that the company would "act in food faith" (*id*. ¶ 299); (5) Scialabba told Hull that he had nothing to worry with respect to the calculation of his commission for the Westlake Expansion & Extension Deal, even though ConvergeOne planned to significantly reduce Hull's earned commissions (*id*. ¶ 300); and (6) ConvergeOne falsely informed Hull that he had to sign the original April Plan in order to be "in compliance" with the company, and that other NAMs were signing the same agreement, under the same time constraints.  (*Id*. ¶¶ 303, 306.)  Hull contends that he reasonably relied on these statements and omissions by continuing to work for ConvergeOne, but never received the benefit on which he relied. (*Id*. ¶¶ 309–10.)

ConvergeOne moves to dismiss Hull's negligent misrepresentation claim, arguing that his claim fails to plausibly allege the elements of causation and reliance.  First, ConvergeOne contends that Hull's allegations "do[] not make causal sense."  (Def.'s Mem.

at 25.)  Because the April Plan never went into effect, ConvergeOne argues, Hull could not have incurred any harm as a result of any misrepresentations or omissions regarding that plan.  (*Id.* at 25 & n.10.)  Second, ConvergeOne argues that Plaintiff fails to plausibly allege that his reliance on several of ConvergeOne's statements was reasonable because they were merely statements of opinion.  (*Id.* at 26.)  Finally, ConvergeOne contends that Hull could not have reasonably relied on the company's representations about the April Plan because ConvergeOne retained the right to amend the plan.  (*Id*. at 26–27.)

In Minnesota, a plaintiff asserting a negligent misrepresentation claim must allege the following elements:  (1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplie[d] false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information.  *Nelson v. Am. Family Mut. Ins. Co.*, 899 F.3d 475, 481 (8th Cir. 2018) (quoting *Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012)).  A plaintiff must demonstrate that the misrepresentation was the proximate cause of the damage.  *See Scribner v. Ally Bank, N.A.*, No. 11-cv-3360 (SRN/JJG), 2012 WL 2999776, at *4 (D. Minn. July 6, 2012) (citing *Davis v. Re-Trac Mfg. Corp.*, 149 N.W.2d 37, 39 (Minn. 1967)).

### 1.    Causation

ConvergeOne argues that because Hull alleges the April Plan never went into effect, no harm could have been caused by any misrepresentations or omissions regarding the April Plan.  (Def.'s Mem. at 25 & n.10.)  Moreover, ConvergeOne notes that because Hull affirmatively pleads that he would have earned a higher commission under the April Plan, it is "hard to see how he was damaged by signing it."  (Def.'s Reply [Doc. No. 70] at 10.)

The Court declines to dismiss Plaintiff's negligent misrepresentation claim on this basis, as it appears to be based on a misreading of the pleading, at least in part. As Plaintiff notes, he does not allege, as a factual matter, that the April Plan never went into effect. (Pl.'s Opp'n at 40–41.)  Rather, he alleges that in July and August 2019, Scialabba told him that the April Plan was "null and void" and that ConvergeOne refused to pay his commission under the terms of that plan. (Second Am. Compl. ¶ 137.)  Hull asserts that he relied on ConvergeOne's misrepresentations about the calculation of commissions under the April Plan, and as a general matter, ConvergeOne's statements that his commissions would be based on actual gross profit margins. (*Id.* ¶¶ 198, 290–310.)  In addition, he alleges that ConvergeOne made these false representations to induce him to sign the April Plan before he closed the Westlake Expansion & Extension Deal. (*Id.* ¶¶ 74, 97, 308.)  All the while, he alleges, ConvergeOne intended to interpret the April Plan in such a way as to lower Hull's commission, (*id.* ¶ 308), apparently regardless of whether an accurate, as-written application of the April Plan would have resulted in an increased commission. (*See id.* ¶ 197.)  As a result of his reliance, Hull contends, he signed the April Plan, continued working for ConvergeOne, and closed the Westlake Expansion & Extension Deal, but never received the benefit of his reliance. (*Id.* ¶ 309.)

Viewing these allegations in the light most favorable to Hull, the Court finds that he sufficiently alleges that ConvergeOne's misstatements proximately caused him harm.

### 2.   Reliance

ConvergeOne also argues that Hull has not, and cannot, allege that he reasonably relied on any false representations. (Def.'s Mem. at 26.)  Specifically, it points to Hull's

allegation that Scialabba informed him that ConvergeOne would act in good faith and that Hull "had nothing to worry about," (Second Am. Compl. ¶¶ 299–300), asserting that such statements are mere opinions, not actionable misrepresentations.  (Def.'s Mem. at 26.)  In addition, ConvergeOne argues that because it retained the right to modify the April Plan, Hull's reliance on any purported misrepresentation was unreasonable.  (*Id*. at 26–27.)

### a.      Statements of Opinion

As to the two statements that ConvergeOne identifies, the Court agrees that they were offered in the form of opinions:  (1) Scialabba told Hull that "he trusted the Company would act in good faith"; and (2) Scialabba told Hull, "In my opinion, and interpretation, I wouldn't think you/we have anything to worry about when it comes to Westlake."  (Second Am. Compl. ¶ 104.)   As statements of opinion, these statements are too "general and indefinite" to be a representation of a fact.  *Trooien v. Mansour*, 608 F.3d 1020, 1029 (8th Cir. 2010) (citing *Martens*, 616 N.W.2d at 747).   Consequently, Hull could not have reasonably relied on them.  Accordingly, the Court grants Defendant's motion to dismiss the portion of Hull's negligent misrepresentation claim that is predicated on these two statements.   However, as the Court has noted, Hull alleges additional, non-opinion misstatements for which dismissal is inappropriate.

### b.      Whether Verbal Representations Contradict Written Contracts

More broadly, ConvergeOne argues that to the extent Hull relied on its representations about the method for calculating commissions in the April Plan, any such reliance was unreasonable because the April Plan granted ConvergeOne the discretion to

modify its terms.  (Def.'s Mem. at 26–27) (citing *Davidson v. Wilson*, 973 F.2d 1391, 1401

(8th Cir. 1992) (finding, in securities fraud case under Minnesota and federal law, that

investors could not justifiably ignore written statements and rely only on contradictory oral

statements); *Ellering v. Sellstate Realty Sys. Network, Inc.*, 801 F. Supp. 2d 834, 845 (D.

Minn. 2011) (holding, in fraudulent inducement action arising under the Minnesota

Franchise Act, that express disclaimer of reliance in controlling contract rendered

plaintiffs' reliance on verbal representations unreasonable).   More specifically, in a

footnote in its Reply, ConvergeOne argues that Hull could not reasonably rely on

Scialabba's April 15, 2019 representation that Hull's Westlake Expansion & Exclusion

Deal commission would be paid under the terms of the 2017 Plan because the statement

contradicts the express wording of the April Plan, which states that it is effective as of April

1, 2019.  (Def.'s Reply at 11 n.6) (citing Second Am. Compl. ¶ 291; Murphy Decl., Ex. 2

(April Plan) at 1)).

It is true that courts may find that justifiable reliance is lacking where the

purportedly relied-upon verbal statements directly contradict a written agreement.

*Davidson*, 973 F.2d at 1401; *Ellering*, 801 F. Supp. 2d at 845.  However, where an oral

representation does not directly contradict a written agreement, courts are generally

disinclined to find as a matter of law that reliance on the oral statement is unjustifiable.

*Minn. Pipe & Equip. Co. v. Ameron Int'l Corp.*, 938 F. Supp. 2d 862, 873, 876 (D. Minn.

2013) (finding that fact issues remained as to justifiable reliance, precluding summary

judgment, where oral representation did not necessarily directly contradict the written

contracts, and where speaker had sole authority to determine certain terms under the

contracts); *see also Prepared Ins. Co. v. Zags, Inc.*, No. 16-cv-1775 (DWF/SER), 2017 WL 875793, at *6 (D. Minn. Mar. 3, 2017) (denying motion to dismiss fraudulent misrepresentation claim where plaintiff alleged that defendant made representations that were not "squarely contradicted by the terms of the Agreement.").

The Court finds that the representations here do not directly contradict the agreement such that dismissal is appropriate. Granted, the April Plan gives ConvergeOne the right to amend or terminate the plan at any time, upon notice to Hull. (Murphy Decl, Ex. 2 (April Plan) at 9.) But Plaintiff alleges that the Westlake Expansion & Extension Deal closed in May 2019, at which time Defendant represented that his commission was governed by the April Plan, purportedly in effect as of April 1, 2019. (Second Am. Compl. ¶ 107.) In July 2019, however, Scialabba told Hull that the April Plan was null and void, (*id.* ¶ 137), and approximately two weeks later, in August 2012, Scialabba stated that the September Plan would replace the 2017 Plan. (*Id.* ¶¶ 139–41.) Under these facts, the Court cannot say that Hull's reliance on ConvergeOne's statements was unreasonable. As Plaintiff states in opposition to the instant motion, "Hull relied on the misrepresentations, believing he would be paid on the Westlake Expansion & Extension Plan pursuant to the plan he had been informed and given notice about, not some future commissions plan not in effect at the time he accomplished the huge Westlake deal—as any reasonable person would." (Pl.'s Opp'n at 42.)

In sum, Plaintiff cannot state a negligent misrepresentation claim based on the two opinion statements—that Scialabba "trusted that the company would act in good faith" and his "opinion and interpretation" that Hull had nothing to worry about—for the reasons

39

discussed earlier.   However, the Court denies ConvergeOne's motion to dismiss the negligent misrepresentation claim in all other respects, as it alleges other non-opinion misrepresentations upon which Hull has sufficiently alleged reasonable reliance. Therefore, Defendant's motion to dismiss is granted in part and denied in part with respect to Hull's negligent misrepresentation claim.

### G.     Promissory Estoppel (Count V)

In his promissory estoppel claim, which Hull pleads in the alternative to his remedies at law, Hull alleges that he detrimentally relied on ConvergeOne's promises regarding his commissions by continuing to work for Converge One.  (Second Am. Compl. ¶¶ 313, 320.)  As with Hull's negligent misrepresentation claim, ConvergeOne argues that Hull fails to sufficiently plead the element of reliance.  (Def.'s Mem. at 27–28.)

In Minnesota, the equitable claim of promissory estoppel claim has three elements: "(1) a clear and definite promise was made; (2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment; and (3) the promise must be enforced to prevent injustice."  *Waters v. Cafesjian*, 946 F. Supp. 2d 876, 882 (D. Minn. 2013) (citing *Martens*, 616 N.W.2d at 746).  With respect to a promissory estoppel claim in the employment context, the element of detrimental reliance requires "an actual change in an employee's position," such as showing that the employee "declined a lucrative opportunity or job offer in reliance on the promise." *Id*. (citations omitted); *see also Diocese of St. Cloud v. Arrowood Indem. Co*., No. 17-cv-2002 (JRT/LIB), 2018 WL 1175421, at *5 (D. Minn. Mar. 6, 2018) (same).  Simply "maintaining the status quo" by continuing to work for an employer does not satisfy the element of detrimental reliance for promissory

40

estoppel. *Waters*, 946 F. Supp.2d at 882; *Dumas v. Kessler & Maguire Funeral Home, Inc*., 380 N.W.2d 544, 548 (Minn. Ct. App. 1986) (holding that continued employment with funeral home was insufficient to satisfy reliance in promissory estoppel claim where employee did not claim he turned down other offers); *cf. Eklund v. Vincent Brass & Aluminum Co*., 351 N.W.2d 371, 378 (Minn. Ct. App. 1984) (finding sufficient reliance shown where employee turned down actual job offer from another employer in reliance on employer's promise).

Hull's pleading does not meet the standard for the equitable claim of promissory estoppel in the employment context. He alleges that he detrimentally relied on ConvergeOne's promises regarding his commissions by continuing to work for his employer. (Second Am. Compl. ¶¶ 313–20.) For example, he contends that ConvergeOne repeatedly encouraged him to "keep working, producing, and generating revenue with Westlake" by telling him that ConvergeOne would honor its promises regarding commission payments. (*Id*. ¶ 316.) As a result of ConvergeOne's promises and Hull's reliance on them, he alleges that he "has worked extremely long and hard for ConvergeOne." (*Id*. ¶ 320.) Because Hull alleges a continuation of his employment, and does not allege, for example, that he declined a better job offer, he has not sufficiently alleged a claim for promissory estoppel. Accordingly, Defendant's motion is granted and Plaintiff's promissory estoppel claim is dismissed with prejudice.

### H.   Unjust Enrichment (Count VI)

Plaintiff also pleads a claim for unjust enrichment in the alternative, arguing that it should be permitted to go forward at this stage of the litigation. (Pl.'s Opp'n at 44–45.)

Hull alleges that:  (1) he procured the Westlake Expansion & Extension Deal, resulting in a "great gross profit margin to his employer"; (2) ConvergeOne retained the benefit of his efforts from that deal and related sales; and (3) ConvergeOne has been unjustly enriched by refusing to pay Hull for that benefit.  (*Id*. ¶¶ 323–26.)

Converge One moves to dismiss this claim, arguing that its conduct was neither illegal or unlawful.  (Def.'s Mem. at 31–32.)  Again, it points to its discretion to modify the terms of the 2017 Plan and the April Plan, and also maintains that it exercised its discretion to declare the April Plan null and void, as the plan permitted.  (*Id*. at 32.)

An unjust enrichment claim sounds in equity and requires the plaintiff to establish the following elements: "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it."  *Dahl*, 742 N.W.2d at 195.  While a plaintiff must demonstrate that the defendant's enrichment was "unjust"—which could involve illegal or unlawful conduct—an unjust enrichment claim may be asserted absent unlawful conduct, "so long as it would be morally wrong for the defendant to retain the benefit."  *Lighthouse Mgmt. Grp., Inc. v. Deutsche Bank Tr. Co. of Am.*, 380 F. Supp. 3d 911, 920 (D. Minn. 2019).

The Court finds that Hull has adequately pleaded ConvergeOne's conduct was unlawful, as he alleges it violated the MPWA. (Second Am. Compl. ¶¶ 228–62.) Furthermore, he has sufficiently pleaded that it would be morally wrong for Converge One to retain his earned commission payments, as he alleges that he successfully closed the Westlake Expansion & Extension Deal in order to benefit his employer, and with the

understanding that he would be compensated if he did so. (*Id.* ¶¶ 322–23.) After ConvergeOne realized sizeable profits from the deal, Hull asserts, it failed to pay him the commissions as promised, and has further refused to pay him a significantly lower commission of $297,000. (*Id.* ¶¶ 162, 164.) Accordingly, the Court finds that Hull has sufficiently alleged that it would be inequitable for ConvergeOne to retain the benefit he conferred. The Court therefore denies Defendant's motion to dismiss Plaintiff's unjust enrichment claim.

## III. CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1. Defendant's Second Motion to Dismiss the Second Amended Complaint [Doc. No. 60] is **GRANTED IN PART** and **DENIED IN PART**.

2. Counts II (failure to pay wages under the Utah Payment of Wages Act), and V (promissory estoppel) are **DISMISSED WITH PREJUDICE**, and a portion of Count IV (negligent misrepresentation and omission) is **DISMISSED WITH PREJUDICE**, as set forth herein.


Dated: November 8, 2021                    s/Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge